Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
03/22/2022 08:06 AM CDT

- 723 -

**Nebraska Court of Appeals Advance Sheets**
**30 Nebraska Appellate Reports**
IN RE INTEREST OF BRELYNN E.
Cite as 30 Neb. App. 723

In re Interest of Brelynn E., a child
under 18 years of age.
State of Nebraska, appellee, v.
Cindy E., appellant.

___ N.W.2d ___

Filed March 15, 2022.    No. A-21-166.

1. **Juvenile Courts: Evidence: Appeal and Error.** Juvenile cases are reviewed de novo on the record, and an appellate court is required to reach a conclusion independent of the juvenile court's findings; however, when the evidence is in conflict, an appellate court may consider and give weight to the fact that the trial court observed the witnesses and accepted one version of the facts over the other.

2. **Appeal and Error.** An appellate court will not consider an issue on appeal that was not presented to or passed upon by the trial court.

3. **Pleadings: Parental Rights.** The purpose of an exception hearing is to determine whether the State may be excused from the mandatory requirement of Neb. Rev. Stat. § 43-292.02(1) (Cum. Supp. 2020) that it file a petition to terminate parental rights under certain circumstances.

4. ____: ____. Under certain circumstances, the State is generally required to file a petition to terminate the parental rights of a child's parents, subject to the outcome of an exception hearing.

5. ____: ____. If a court determines that a statutory exception under Neb. Rev. Stat. § 43-292.02 (Cum. Supp. 2020) does not exist, then the State is required to file a petition to terminate parental rights.

6. ____: ____. If a statutory exception under Neb. Rev. Stat. § 43-292.02 (Cum. Supp. 2020) exists, then the State is not required to file a petition to terminate parental rights but may do so anyway.

7. **Juvenile Courts: Parental Rights.** For a juvenile court to terminate parental rights under Neb. Rev. Stat. § 43-292 (Reissue 2016), it must find that one or more of the statutory grounds listed in this section have been satisfied and that such termination is in the child's best interests.

- 724 -

Nebraska Court of Appeals Advance Sheets
30 Nebraska Appellate Reports
IN RE INTEREST OF BRELYNN E.
Cite as 30 Neb. App. 723

8. **Parental Rights: Proof.** Neb. Rev. Stat. § 43-292(7) (Reissue 2016) allows for termination of parental rights when a juvenile has been in an out-of-home placement for 15 or more months of the most recent 22 months. It operates mechanically and, unlike the other subsections of the statute, does not require the State to adduce evidence of any specific fault on the part of a parent.

9. **Parental Rights.** The proper application of Neb. Rev. Stat. § 43-292(7) (Reissue 2016) consists of counting the most recent 22 months preceding the filing of the petition to terminate parental rights, followed by counting how many of those 22 months the child was in out-of-home placement.

10. **Parental Rights: Proof.** Neb. Rev. Stat. § 43-292 (Reissue 2016) provides 11 separate conditions, any one of which can serve as the basis for termination of parental rights when coupled with the evidence that termination is in the best interests of the child.

11. ____: ____. In addition to proving a statutory ground, the State must show that termination of parental rights is in the best interests of the child.

12. **Parental Rights: Words and Phrases.** The term "unfitness" is not expressly used in Neb. Rev. Stat. § 43-292 (Reissue 2016), but the concept is generally encompassed by the fault and neglect subsections of that statute, and also through a determination of the child's best interests.

13. **Constitutional Law: Parental Rights: Words and Phrases.** In the context of the constitutionally protected relationship between a parent and a child, parental unfitness means a personal deficiency or incapacity which has prevented, or will probably prevent, performance of a reasonable parental obligation in child rearing and which caused, or probably will result in, detriment to the child's well-being.

14. **Parental Rights: Parent and Child.** In proceedings to terminate parental rights, the law does not require perfection of a parent; instead, courts should look for the parent's continued improvement in parenting skills and a beneficial relationship between a parent and a child.

Appeal from the County Court for Buffalo County: John P. Rademacher, Judge. Affirmed.

Michele J. Romero, of Stamm Romero & Associates, P.C., L.L.O., for appellant.

Patrick M. Lee, Deputy Buffalo County Attorney, for appellant.

- 725 -

Nebraska Court of Appeals Advance Sheets
30 Nebraska Appellate Reports
IN RE INTEREST OF BRELYNN E.
Cite as 30 Neb. App. 723

Jennifer N. Rowling, guardian ad litem.

Moore, Bishop, and Arterburn, Judges.

Arterburn, Judge.

## INTRODUCTION

Cindy E. appeals from the order of the county court for Buffalo County, sitting as a juvenile court, which terminated her parental rights to her child Brelynn E. Based on the reasons that follow, we affirm.

## BACKGROUND

Cindy is the biological mother of Brelynn, who was born in August 2015. Cindy has two older children, one of whom resides with his paternal grandparents after she voluntarily relinquished her parental rights to him and the other of whom has been placed in a guardianship as a result of a prior juvenile court case involving Cindy. These two children were not involved in the present juvenile court proceedings and, as a result, are not part of this appeal. In addition, the fathers of Cindy's other children were not involved in the juvenile court proceedings below and are not part of this appeal. Wesley E. is the father of Brelynn; however, he relinquished his parental rights to Brelynn on September 28, 2020, during the course of the termination trial.

Brelynn has been removed from Cindy's care by the Department of Health and Human Services (the Department) on two occasions prior to the filing of the present case. Cindy had a voluntary case with the Department in May 2016, following reports that Wesley sexually assaulted Brelynn. Wesley was ultimately convicted of sexually assaulting Brelynn when she was approximately 9 months old. Brelynn was not in Cindy's care for approximately 1 week. In June 2017, Brelynn was again removed from the home. She was returned to Cindy's home in December 2017, but remained in the Department's legal custody until June 2018. This removal was due to concerns

- 726 -

Nebraska Court of Appeals Advance Sheets
30 Nebraska Appellate Reports
IN RE INTEREST OF BRELYNN E.
Cite as 30 Neb. App. 723

regarding Cindy's mental health and regarding Cindy's leaving Brelynn with inappropriate caregivers, including Cindy's sister, whose husband was a registered sex offender.

Because of the concerns about Cindy's mental health, the Department contacted Dr. John Meidlinger, a licensed clinical psychologist, to complete an evaluation in July 2017. Meidlinger diagnosed Cindy with adjustment disorder, anxious mood, and post-traumatic stress disorder, as well as a personality disorder with narcissistic and avoidant features. In his evaluation, he expressed that he would want to see stability in all aspects of Cindy's life before he felt that Brelynn should be placed with Cindy again. Specifically, he noted that if Cindy did not have mental health stability and regulation in place, Brelynn would not be able to trust Cindy and would develop patterns of codependency. In addition, in his opinion, Brelynn could become "[an] easy target[] for unscrupulous peers and adults." According to Meidlinger, Cindy would continue to struggle with her mental health unless she worked more than once a week on identifying and implementing coping strategies for her mental health. In his opinion, Cindy does not have an ability to experience adversity and then turn the adversity into a useful path forward. He believes that it would be useful for her to be placed in a 24-hour inpatient facility to teach her the emotional skills that she needs. In addition, he expressed that part of Cindy's narcissistic tendencies would be to seek excessive medical attention for a child as a way of getting attention for herself.

Meidlinger noted his concerns about Cindy's parenting ability. His evaluation noted that Cindy continued to see Wesley after she was convinced Wesley was sexually abusing Brelynn and that Cindy went on to have another child with Wesley. Meidlinger testified that Cindy felt "justified" in leaving Brelynn in the care of her sister and brother-in-law, despite her brother-in-law's also being a registered sex offender. Meidlinger observed Cindy with Brelynn and observed that Cindy did not engage well with Brelynn. He testified that

- 727 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
30 NEBRASKA APPELLATE REPORTS
IN RE INTEREST OF BRELYNN E.
Cite as 30 Neb. App. 723

Cindy did not know "how to create space and interact with [Brelynn]." He also noted that Cindy could not manage minor tasks with Brelynn. Meidlinger expressed his concern that when Cindy and Brelynn were at his office, Cindy did not escort Brelynn to his office, despite Brelynn's previously being sexually assaulted by a male. He also observed that Cindy did not appropriately interact with Brelynn in the way that she talked with Brelynn and did not know how to structure play-time with Brelynn. He was concerned about Cindy's ability to make good judgments about Brelynn.

Despite the involvement of the Department in Cindy's and Brelynn's lives from 2016 to 2018, it was the death of Cindy and Wesley's other child, Kamdyn W., which precipitated the current case. Kamdyn was born in September 2018. When Kamdyn was approximately 2 months old, he suffered from a cold. Kamdyn was sleeping on a "Boppy" style pillow in Cindy's bed, at a 45-degree angle, due to his cold, and he rolled off of the pillow onto his stomach. He was transported to the emergency room in an unresponsive condition. The cause of death was determined to be asphyxiation.

Dr. Angela Kratochvil-Stava, a pediatrician who treated both Brelynn and Kamdyn, testified about the instructions she gave to Cindy about safe sleep for babies. She explained that after a baby is born, the parents are required to watch videos on safe sleep for babies. She testified that these videos instruct parents on the appropriate way for a baby to sleep, specifically that the baby is to be placed on his or her back in his or her own bed. Kratochvil-Stava further testified that if a baby has a cold, she advises the parents that the baby should remain on a firm mattress but that the head can be elevated by lifting up the mattress about 15 to 20 degrees by placing something underneath one end. Kamdyn suffered a cold when he was approximately 2 months old. Cindy told the officers investigating the death that her doctor had instructed her to have Kamdyn sleep on a "Boppy" style pillow due to his cold and at a 45-degree angle. According to Cindy, one night, when he was

- 728 -

Nebraska Court of Appeals Advance Sheets
30 Nebraska Appellate Reports
IN RE INTEREST OF BRELYNN E.
Cite as 30 Neb. App. 723

sleeping on this style of pillow, he rolled off of the pillow onto his stomach, which resulted in his death. Kratochvil-Stava denied advising Cindy to use this style of pillow to prop Kamdyn up.

As part of the investigation of Kamdyn's death, law enforcement investigated Cindy's residence. Harley Amy, an investigator with the Buffalo County sheriff's office, observed that there were prescription medications in bottles, as well as loose medications, within Brelynn's reach. He testified that there was a bassinet in Cindy's bedroom; however, the bassinet was full of items, including a basket of prescription medications and toys. In addition, there was cough medicine spilled in the bassinet that had not been cleaned up. He also observed that there was mold growing on items in the kitchen and that the residence smelled of feces and urine. Amy authored an affidavit requesting removal of Brelynn based on the uncleanliness of the home and Kamdyn's death. The affidavit also noted that Brelynn had been previously sexually abused.

On November 6, 2018, the State filed a petition requesting that Brelynn be adjudicated as a juvenile under Neb. Rev. Stat. § 43-247(3)(a) (Reissue 2016). The State asserted that Brelynn had previously been in the care and custody of the Department from June 2017 to June 2018 following reports of Cindy's inability to leave Brelynn with appropriate caretakers, an unsanitary home, and Cindy's mental health issues which placed Brelynn at risk of harm. In addition, it was noted that Brelynn had been previously sexually assaulted by Wesley.

Brelynn was removed from Cindy's residence and was placed with her maternal grandmother, Carol Gaedeke, in November 2018. However, after approximately 10 days, Gaedeke requested that Brelynn be removed from her home. According to Gaedeke, she requested that Brelynn be removed in part due to conflict she was experiencing with Cindy along with the grief she was experiencing due to Kamdyn's death. The Department then placed Brelynn into foster care. After a couple of shorter-term placements, Brelynn was placed with

- 729 -

Nebraska Court of Appeals Advance Sheets
30 Nebraska Appellate Reports
IN RE INTEREST OF BRELYNN E.
Cite as 30 Neb. App. 723

a foster family in July 2019 who would consider providing a permanent home for Brelynn, should that be necessary. Later, on April 4, 2019, Gaedeke wrote an email to the court requesting that if Cindy's parental rights to Brelynn were to be terminated and Brelynn was to be adopted, Gaedeke would want to be considered for her adoption. The court noted that it did not consider or review the email and forwarded the email to the attorneys. Although Brelynn lived in more than one foster home, she was not again placed with Gaedeke; nor did she return to Cindy's care. Cindy continued to have supervised visits with Brelynn throughout the pendency of the case.

On March 9, 2020, Cindy filed a motion for an exception. She asked for the court to grant her an exception to the State's duty to file a petition for termination of parental rights under Neb. Rev. Stat. § 43-292.02(3)(b) (Cum. Supp. 2020). She asserted that although more than 15 months had passed since Brelynn was in the care of a nonrelative, she had not had a reasonable opportunity to avail herself of the services deemed necessary in the case plan. The court did not hold a hearing on Cindy's motion.

Two days later, on March 11, 2020, the State filed a motion for termination of Cindy's parental rights. The State alleged that Brelynn had been in the care and custody of the Department since November 2018. The State asserted that Brelynn had been previously removed from Cindy's care from May 26 until May 31, 2016, and June 2017 until December 2017. The State asserted that the grounds for termination of Cindy's parental rights were based on Neb. Rev. Stat. § 43-292(5), (6), and (7) (Reissue 2016). The State alleged that Cindy was unable to discharge her parental responsibilities because of mental illness or mental deficiency and that there were reasonable grounds to believe that this condition would continue for a prolonged indeterminate period; that reasonable efforts to preserve and unify the family had failed to correct the conditions; and that Brelynn had been placed in an out-of-home placement for 15 or more months of the most recent 22 months. On June 1,

- 730 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
30 NEBRASKA APPELLATE REPORTS
IN RE INTEREST OF BRELYNN E.
Cite as 30 Neb. App. 723

2020, Gaedeke filed a complaint to intervene, stating that she wished to have permanent placement of Brelynn if Cindy's parental rights were terminated.

Trial on the motion for termination began on September 10, 2020, and continued for 6 days over the next few months, ending on December 10. Numerous witnesses testified, including Meidlinger, Kratochvil-Stava, Gaedeke, and Amy. In addition, Cindy testified. We note that when Amy testified at trial, Cindy objected, citing the doctrine of oneness and affinity, because he was married to the State's prosecuting attorney. She argued that Amy's testimony should be stricken. The court overruled the motion. Several other mental health practitioners and caseworkers, as well as Brelynn's foster parents, also testified. In addition to the testimony recounted earlier, the following evidence germane to our decision was adduced:

Samantha Keim, a child and family services specialist with the Department, testified that the Department received a phone call regarding an unresponsive child in Cindy's home. During the course of the Department's investigation, investigators learned that the house was not clean, that there were medications within reach of Brelynn, and that further concerns existed regarding Cindy's mental health. Keim explained that after Brelynn was removed from the home for the third time, in November 2018, it was determined that the initial goal of the case should be reunification. Keim testified that the uncleanliness of the home was alleviated and that the concerns for Cindy's mental health were not "as extreme at that point." However, she also testified that Cindy's actions prevented reunification from occurring. Keim explained that in January 2019, Cindy and her boyfriend at the time, Nathan Wheeler, began yelling and using profanities toward visitation supervisors. Another incident occurred in March 2019 in which law enforcement had to be called. Keim explained that the visitation worker requested Cindy to put Brelynn into a car seat and to adjust the car seat. Keim explained that Cindy then noticed the car seat was not attached and pushed the car seat, which

made Brelynn fall into the back of the driver's seat. Cindy and Wheeler began yelling at the worker. Keim explained that law enforcement was called because Cindy and Wheeler refused to give Brelynn back to the visitation worker. The Department made a determination, based in part on these incidents, that Cindy needed to demonstrate an ability to act respectfully and to appropriately communicate with others in a moment of crisis.

Brelynn worked with Jordan McCoy, a child, adolescent, and family counselor, beginning in August 2017, prior to the start of the current county court proceedings. After the start of the proceedings, from November 2018 until March 2019, McCoy saw Cindy and Brelynn for child-parent psychotherapy (CPP). McCoy explained that CPP is a therapy that focuses on the relationship between a child and a caretaker and how the parent's mental health impacts this relationship. McCoy observed that Brelynn struggled with anxiety, a heightened amount of worries, and emotional dysregulation. In addition, Brelynn's social and emotional development was lagging. McCoy also observed that Brelynn would attempt to control situations because she did not feel safe. She provided an example, that Brelynn would attempt to control getting her shoes on and what she wanted to eat. McCoy diagnosed Brelynn with other specified trauma and a stressor-related disorder. McCoy also explained that Brelynn presented with significant symptoms related to the trauma that arose from Wesley's sexual abuse, as well as neglect and insecure attachment patterns with respect to Cindy.

McCoy observed how Cindy's mental health affected Brelynn. In McCoy's opinion, Brelynn initially believed that adults were not safe or consistent. McCoy testified that when Cindy was consistent, Brelynn's symptoms would improve, but that when Cindy was not consistent, Brelynn would struggle. McCoy also explained that after the death of Kamdyn, Brelynn's mental health was linked to Cindy's mental health, such that when Cindy would have a good mental health day, Brelynn would have a better mental health day. McCoy also

- 732 -

Nebraska Court of Appeals Advance Sheets
30 Nebraska Appellate Reports
IN RE INTEREST OF BRELYNN E.
Cite as 30 Neb. App. 723

observed that Brelynn's emotional needs were not being consistently met. McCoy testified that when Cindy's mental health was not good, Brelynn would take on the role of caretaker in a role reversal. McCoy did witness progress with Cindy's mental health at times but found that it was not consistent. McCoy testified that although Cindy reported that she had taken parenting classes multiple times, she struggled with implementing the concepts she learned on a consistent basis. Cindy's ability to parent and implement what she learned was dependent on her mental health. Cindy stopped seeing McCoy in March 2019 after McCoy needed to redirect Cindy multiple times to focus on Brelynn's needs as opposed to Cindy's needs.

Keim contacted Thomas Maxson, a mental health therapist, about Cindy's beginning individual therapy in March 2019. Cindy testified that she did not like to work with Maxson because Maxson previously worked with Wesley and she did not believe his therapeutic style was beneficial to her. Maxson testified that Cindy told him that he was too intrusive and intense; however, Maxson also explained that this opinion arose only after he told Cindy his concerns about her moving to Hershey, Nebraska, in 2019, which would have required her to change providers and the effects that change may have regarding custody of Brelynn.

Maxson diagnosed Cindy with major depressive disorder, borderline personality disorder, and post-traumatic stress disorder. Maxson explained that borderline personality disorder is characterized by emotional dysregulation when relationships are cyclical between things going well one day and poorly the next. He also explained that typically, people who suffer from borderline personality disorder often have suicidal and self-harm ideation, difficulties with maintaining relationships, and emotional upheaval. Maxson reported that these disorders usually exist on a continuum and can be actively managed through work and application of what was learned in dialectical behavioral therapy (DBT). DBT is a specific type of intervention specifically created for people with suicidal ideation and

for people with borderline personality disorder. According to Maxson, DBT focuses on the skill deficits found in persons who suffer from borderline personality disorder. The therapeutic process is designed to teach the patient emotional regulation skills, interpersonal effectiveness in how to ask for what the patient needs, distress tolerance skills, and tolerating strong emotion without causing harm, in addition to mindfulness skills. Cindy provided a letter to Maxson in June 2019 that she would no longer work with him.

Cindy began attending DBT with Jamie Babutzke, another mental health therapist, in April 2019. Babutzke diagnosed Cindy with major depressive disorder, recurrent; post-traumatic stress disorder; and borderline personality disorder. Babutzke testified that Cindy attended the DBT sessions and attempted to use what she learned in her everyday life, but Babutzke noted that it was a "process." Babutzke explained that Cindy's mental health would be cyclical, where she would have periods when she would do very well and periods that would not go as well. Babutzke observed in Cindy what she described as a "pervasive pattern of instability in interpersonal relationships, self-image, and impulsivity." She also observed "recurrent suicidal behavior, gestures, and threats" that affected her instability due to "marked reactivity of mood, and trouble controlling anger." She conceded that in the period nearest trial, Cindy had been less able to use the skills from DBT than she had in the past.

Babutzke stated that she has not observed Cindy with her children and that her reports are based only on interactions with Cindy, visitation notes from the Department, and collateral contacts. She testified that she had conversations with Samantha Byrns, a therapist whom Cindy and Brelynn also worked with at the time, about addressing grief and loss so that Byrns could have more effective CPP with Cindy and Brelynn. After reviewing visitation notes, Babutzke conceded that Cindy had not provided emotional safety to Brelynn on several occasions.

- 734 -

Nebraska Court of Appeals Advance Sheets
30 Nebraska Appellate Reports
IN RE INTEREST OF BRELYNN E.
Cite as 30 Neb. App. 723

Byrns, a therapist who specializes in trauma treatment, also treated Cindy and Brelynn and engaged in CPP with them beginning in September 2019. Cindy and Brelynn had switched providers after ending the relationship with McCoy. However, Byrns testified that there were numerous delays in starting CPP. Byrns believed that Cindy did not trust her and that as a result, Cindy did not complete an initial interview in a timely fashion. According to Byrns, Cindy wanted Byrns neither to have access to the Department's case file and intake form nor to communicate with the Department. Byrns testified that Cindy frequently wanted to discuss personal issues with Byrns which prevented them from completing CPP. Byrns expressed her concerns that the issues that Meidlinger pointed out 3 years earlier were still present.

Dr. Narayana Koduri, a psychiatrist, began seeing Cindy in January 2020. Koduri diagnosed Cindy with post-traumatic stress disorder, major depressive disorder, and borderline personality disorder. According to him, Cindy had a psychiatric appointment approximately once per month and based on his observations of the refill records, Cindy was taking her medicine appropriately. He acknowledged that Cindy had 15 prior hospitalizations due to mental health issues. While under his care, Cindy was twice hospitalized in 2020, which hospitalizations, in his opinion, were linked to grief- or stress-related responses by Cindy. He noted that although it was concerning that Cindy's condition had on those occasions deteriorated to the point of requiring hospitalization, he was encouraged that Cindy recognized when she was experiencing symptoms, which prompted her to seek inpatient help.

Kratochvil-Stava testified as to Cindy's parenting when Brelynn was younger. She explained that when Brelynn was 9 months old, she would need to cough a lot, and Kratochvil-Stava's observation was that Cindy and Wheeler were very aggressive to get these "cough[s] out." Kratochvil-Stava testified that when Brelynn would cough while seated in her car seat, Cindy and Wheeler would flip the car seat

- 735 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
30 NEBRASKA APPELLATE REPORTS
IN RE INTEREST OF BRELYNN E.
Cite as 30 Neb. App. 723

over to get her "to cough out whatever was bothering her." Kratochvil-Stava expressed some concerns over whether there was proper supervision of Brelynn, because Brelynn needed to get stitches after falling out of bed and suffered a burn from touching a hot stove. Kratochvil-Stava also spent significant time educating Cindy on what a healthy genital area looks like, because Cindy asked Kratochvil-Stava to conduct an anatomy check each time Cindy brought Brelynn in.

There was significant testimony regarding Cindy's taking Brelynn to excessive doctor appointments. Keim observed that Cindy took Brelynn to the doctor very often for small things and that often, the doctor would report that there was nothing wrong. S.C., a foster parent for Brelynn, testified that during the 7 months Brelynn was in her care, Brelynn had 14 different doctor appointments, mostly regarding holding her stool. Another foster parent, K.W., believed that the number of doctor appointments that Cindy scheduled for Brelynn was excessive. According to both of these foster parents, Brelynn would struggle with attending doctor and dentist appointments only if Cindy was also there. At doctor appointments, S.C. observed Cindy express anger about issues that affected only Cindy and were not relevant to Brelynn. All of the foster parents testified that Cindy was not accurate in the reporting of health issues to Brelynn's doctor. Cindy would often give accounts regarding Brelynn's health conflicting with the reports given by the foster parents.

Brelynn had constipation issues that necessitated doctor appointments for her. Kratochvil-Stava testified that she treated Brelynn with oral medication for constipation but that it was often insufficient. At one point, Brelynn would need either to take a suppository or to undergo an invasive procedure at the hospital. S.C. and her husband were able to give Brelynn a suppository without any issues. However, Cindy was not able to do so, because Brelynn became agitated. Cindy called Kratochvil-Stava and stated that there would be no more suppositories for Brelynn. Because Cindy did not want to go

- 736 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
30 NEBRASKA APPELLATE REPORTS
IN RE INTEREST OF BRELYNN E.
Cite as 30 Neb. App. 723

forward with the suppository, Brelynn needed to undergo an invasive procedure. Before the procedure, Brelynn needed to drink a certain liquid medicine that children are typically not able to drink. Kratochvil-Stava explained that if a child is unable to drink the medicine, a tube would need to be inserted that would run from the child's nose to the child's stomach. Brelynn was able to drink the medicine after Cindy was able to convince her. Kratochvil-Stava opined that the constipation issues were behavioral issues that had to do with Brelynn's controlling when she would stool. These issues largely resolved during periods when visitation was suspended.

Both the caseworkers assigned to the case and the foster parents who testified reported that Cindy had difficulties being honest with them. Keim testified that she could not determine if information she received from Cindy about her mental health appointments and Brelynn's medical condition was truthful or accurate. Keim needed to contact the provider to confirm the accuracy of information provided. She testified that information she received from Cindy was often not accurate. Hope Holmes, a child and family services specialist employed with the Department, testified that during the time she was assigned to the case, Cindy had difficulties maintaining honesty with the Department.

The caseworkers employed with the Department had difficulties working with Cindy throughout the case. Keim had negative interactions with Cindy, including that Cindy would yell at her, would call her supervisor to complain, and was dishonest with her. Holmes also explained that there were a number of visitation workers assigned to the case because the workers reported difficulties in working with Cindy. She also explained that Cindy would make complaints to the Department about caseworkers which would also necessitate changing the workers involved with Cindy. Holmes also explained that she spent time encouraging Cindy and the foster parents to be able to communicate with each other, but was not successful.

- 737 -

Nebraska Court of Appeals Advance Sheets
30 Nebraska Appellate Reports
IN RE INTEREST OF BRELYNN E.
Cite as 30 Neb. App. 723

There were concerns expressed about Cindy's ability to lead a stable lifestyle. From July 2019 until the time of trial, Cindy had five different jobs. At times, she worked very few hours per week, while at other times, she worked full time. Cindy accounted for the frequent changes by saying that she was prioritizing her visits with Brelynn as opposed to working. Holmes testified that Cindy's pattern with parenting was also one of instability. She noted that when the Department worked with Cindy in 2017, there were concerns regarding the cleanliness of the house, and that the cleanliness of the house was also an issue in 2018. Holmes also testified that in her opinion, she has concerns about Cindy's ability to pay her rent and bills without relying on community resources. She noted that even though Cindy lives in subsidized housing where her rent is low, she has still had to seek assistance paying for utilities and transportation. Holmes also expressed concern that despite having years of therapy and counseling, Cindy continued to experience events which exacerbated Cindy's mental health struggles.

Holmes also noted that whenever the Department lessened its involvement in Cindy's day-to-day life, her circumstances would regress, often back to what things were like before any Departmental involvement. Holmes expressed concern that Cindy would be unable to maintain long-term stability. She noted that Cindy was able to show stability in her mental health and employment at various points during the pendency of the case, but could not sustain her progress for a significant period.

K.W., one of Brelynn's prior foster parents, testified as to her experience with Cindy and Brelynn. When Brelynn was 2 years old, she moved into K.W.'s home. K.W. testified that Brelynn was fearful and anxious when Brelynn first moved into her home and was toilet trained. However, when visitations occurred with Cindy, Brelynn began to have regressions with respect to using the restroom. K.W. testified that when Brelynn would return from visitations with Cindy, Brelynn

- 738 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
30 NEBRASKA APPELLATE REPORTS
IN RE INTEREST OF BRELYNN E.
Cite as 30 Neb. App. 723

was not always fed or clean. K.W. observed that Cindy provided inaccurate information at doctor appointments. In addition, at one doctor appointment when K.W. was the only one in the room with Cindy and Brelynn, Cindy told Brelynn, "[D]on't worry, Brelynn, Mommy and Daddy won't hurt you, but someone in this room may." K.W. testified that soon after that, she decided not to be Brelynn's foster parent any longer because she was afraid of Cindy.

S.C. also testified as to her difficulties with Cindy and Brelynn. When Brelynn came to live with S.C.'s family, Brelynn needed to control her environment. S.C. explained that when visits with Cindy stopped, Brelynn's behavior changed. According to S.C., Brelynn was "fixated on whether or not Cindy was okay." S.C. also testified that when Brelynn lived with her, Cindy "tried to control our house." Examples of Cindy's trying to control included stating what diapers to use or what milk Brelynn could drink. S.C. also testified that Cindy would report to the Department different information from the doctor than she in fact received from the doctor. S.C. testified that the reason she decided to not continue as a foster parent for Brelynn was because she did not want to work with Cindy over an extended period of time.

T.J., who was one of Brelynn's foster parents at the time of trial, testified as to her experience with Cindy. Brelynn began living with T.J. when Brelynn was 3 years old. When Brelynn began living with T.J., Brelynn was "afraid of everything." T.J. testified that Brelynn struggled when she saw Cindy, especially with respect to using the restroom. Upon coming to T.J.'s home, Brelynn expressed her desire to be potty trained, which was accomplished within a week. However, when Brelynn was returned from a visit with Cindy, she would be wearing "Pull-ups." Brelynn would demand to be put back into underwear upon her return. T.J. explained that she attempted to communicate with Cindy; however, Cindy stopped communicating information to her. T.J. also observed that Brelynn did not always want to visit with Cindy and that

- 739 -

Nebraska Court of Appeals Advance Sheets
30 Nebraska Appellate Reports
IN RE INTEREST OF BRELYNN E.
Cite as 30 Neb. App. 723

since visitations with Cindy stopped, Brelynn was happier and acting better.

Cindy's mother, Gaedeke, testified as to her relationship with Cindy and Brelynn. She explained that she was the original placement for Brelynn in November 2018. However, she explained that Cindy and she had a "breakdown in communication" where Cindy was attempting to direct Gaedeke how to take care of Brelynn. She believed that she was capable of taking care of Brelynn. Gaedeke explained that during the pendency of the case, she had not been contacted to have placement again. She believed that Cindy's mental health had improved through the pendency of the case, and she had no concerns about Cindy's ability to parent Brelynn.

Cindy testified as to her own progress throughout the case. She believes that the goals in the present case should be the same as those in the last case, which ended in reunification. She explained that in her opinion, she has met the goals of having a clean home and healthy relationships. She believes that her mental health has greatly improved since she completed DBT. She also believes that Koduri is a much better fit for her mental health and believes that he has provided "the best med management [she had] ever had." She also explained that she has been on medication, consistently, throughout the pendency of the case.

Cindy also addressed several issues regarding her mental health. She conceded that her first mental-health-related hospitalization occurred when she was 12 or 13 years old. She also acknowledged that she has had auditory or visual hallucinations for at least 12 years. She explained that she has had numerous therapists or counselors during this case because she has, at various points, believed that her right to confidentiality was not being upheld. She also questioned the accuracy of some of the reporting to the Department. She explained that she stopped seeing McCoy because she did not believe she could trust McCoy but then, after transferring CPP to Byrns, later requested McCoy to work with her again.

- 740 -

Nebraska Court of Appeals Advance Sheets
30 Nebraska Appellate Reports
IN RE INTEREST OF BRELYNN E.
Cite as 30 Neb. App. 723

She acknowledged that she "was horrible" in her behavior toward caseworkers and others at the beginning of the case, but believes that her mental health has improved. She conceded that she had an anxiety attack in April 2018 leading to inpatient treatment. She also conceded that in 2019, she became "very depressed and tried to commit suicide" and as a result was hospitalized. According to Cindy, she was hospitalized three times in 2020 due to her mental health, with the last time occurring in August 2020. Koduri explained that Cindy's hospitalizations were results of suicidal thinking with respect to grief reactions. However, Koduri observed that these were not suicidal attempts.

Cindy addressed the testimony that she took Brelynn to doctor appointments too often. She testified that in her previous case, the Department believed that Cindy was not meeting Brelynn's medical needs adequately. She testified that Keim previously told her that "it is better to take your child to the doctor and have them tell you that it's nothing and go home than for it to be something and not have taken them in." She also believed that the Department and foster parents were ignoring signs and symptoms of Brelynn's having urinary tract infections. According to Cindy, the tests for whether Brelynn had such an infection was noninvasive and she would often test positive.

Cindy also testified as to the impact of therapy with Brelynn. According to Cindy, Brelynn preferred McCoy because the style of therapy was more conducive to their relationship. She explained that there were a number of cancellations for her therapy appointments with Byrns. She explained about an incident where Byrns canceled the day of the appointment, which upset Brelynn. Cindy explained that when the COVID-19 pandemic occurred, Byrns was unable to conduct therapy sessions because of technology issues. She acknowledged that there were difficulties in establishing her relationship with Byrns after leaving McCoy as a therapist. However, she believed these difficulties were because of Brelynn's struggles to transition from McCoy to Byrns.

- 741 -

Nebraska Court of Appeals Advance Sheets
30 Nebraska Appellate Reports
IN RE INTEREST OF BRELYNN E.
Cite as 30 Neb. App. 723

On January 29, 2021, the county court entered its extensive order terminating Cindy's parental rights to Brelynn. The court determined that the State presented clear and convincing evidence to substantiate terminating Cindy's parental rights pursuant to § 43-292(5), (6), and (7) and that termination was in the best interests of Brelynn. The court noted that Cindy's testimony lacked credibility, based on its observations and on Cindy's having admitted to lying to individuals involved in this case. The court also noted that numerous witnesses testified as to Cindy's lack of honesty during the case.

The court first determined that the State had proved that Cindy is unable to discharge her parental responsibilities to Brelynn because of mental illness which will continue for a prolonged and indeterminate period. The court found that Cindy's mental health history led her to numerous inpatient stays, suicidal thoughts, poor judgment, and abusive and unstable relationships. In so finding, the court noted the expert testimony of Meidlinger and several of the therapists who had provided counseling to Cindy. It noted their opinions which indicated that given the severity of the mental health conditions from which Cindy suffers together with her record of being unable to sustain long-term progress, meaningful improvement of her mental health condition could not be expected.

The court also found that reasonable efforts to preserve and unify the family had been made. The court noted that three primary goals were identified for Cindy to achieve, those being a safe and suitable living environment characterized by a clean home and healthy relationships, the maintenance of mental health, and the acquisition of the ability to meet Brelynn's needs. The court found that Cindy struggled with having healthy relationships, had not maintained stability in her mental health, and had not been able to consistently meet Brelynn's needs. The court noted several instances of Cindy's engaging in behaviors contrary to Brelynn's needs. Therefore, despite significant efforts made by the Department to achieve reunification, Cindy had not progressed satisfactorily. Finally,

- 742 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
30 NEBRASKA APPELLATE REPORTS
IN RE INTEREST OF BRELYNN E.
Cite as 30 Neb. App. 723

the court also found that Brelynn had been placed out of her parental home for over 16 of the past 22 consecutive months at the time of the State's filing of the motion for termination of parental rights and had remained in out-of-home placement since that filing.

The court found that it was in the best interests of Brelynn for Cindy's parental rights to be terminated. The court found that Cindy engaged in a pattern of failing to make good decisions for herself and Brelynn. After noting that Brelynn had been out of Cindy's care on three separate occasions, the court concluded that Cindy had not shown improvement in her parenting skills and mental health. The court found that Cindy had not established a beneficial relationship with Brelynn. The court explained that Cindy struggled to compose herself in engaging with professionals and that there were concerns she did not focus on Brelynn's needs. The court determined that based on the testimony of Brelynn's therapists, Brelynn's emotional development and social development were lagging due to Cindy's inability to find mental stability and appropriately prioritize Brelynn's needs. The court noted the opinions of McCoy and Byrns, who testified they believed that Brelynn's anxiety and stressors would resolve with consistent support, but found that Cindy was unwilling or unable to provide that support.

Cindy now appeals to this court.

## ASSIGNMENTS OF ERROR

Cindy's assignments of error, consolidated, reordered, and restated, are that the county court erred when it denied Gaedeke placement of Brelynn during the pendency of the case, when it did not hold a hearing on Cindy's motion for an exception, and when it allowed the testimony of Amy. In addition, Cindy assigns that the county court erred when it found that the State proved by clear and convincing evidence statutory grounds to justify the termination of her parental rights and that it was in the best interests of Brelynn for her rights to be terminated.

- 743 -

Nebraska Court of Appeals Advance Sheets
30 Nebraska Appellate Reports
IN RE INTEREST OF BRELYNN E.
Cite as 30 Neb. App. 723

## STANDARD OF REVIEW

[1] Juvenile cases are reviewed de novo on the record, and an appellate court is required to reach a conclusion independent of the juvenile court's findings; however, when the evidence is in conflict, an appellate court may consider and give weight to the fact that the trial court observed the witnesses and accepted one version of the facts over the other. *In re Interest of A.A. et al.*, 307 Neb. 817, 951 N.W.2d 144 (2020).

## ANALYSIS

*Denial of Placement.*

Cindy argues that the county court erred in not placing Brelynn with Gaedeke during the pendency of the case, because she requested placement of Brelynn and it is the Department's policy to prioritize placement of a child with family members.

[2] However, we do not reach this assignment of error upon appeal. After Gaedeke had asked for Brelynn to be removed from her home, Gaedeke sent an email requesting only that she be considered for placement in the event that Cindy's parental rights were terminated. Gaedeke later filed a complaint to intervene; however, her complaint to intervene was filed after the State sought termination and reiterated only that should Cindy's rights be terminated, she wished to be considered for Brelynn's permanent placement. She did not request temporary placement of Brelynn during the pendency of the case, nor did she petition the court for temporary placement. There was no pending motion in front of the county court asking the court to consider Gaedeke as a placement for Brelynn. As such, the court was never asked to consider placing Brelynn with Gaedeke during the pendency of the proceedings. An appellate court will not consider an issue on appeal that was not presented to or passed upon by the trial court. *In re Guardianship & Conservatorship of J.F.*, 307 Neb. 452, 949 N.W.2d 496 (2020). Accordingly, we do not address this assignment of error.

- 744 -

Nebraska Court of Appeals Advance Sheets
30 Nebraska Appellate Reports
IN RE INTEREST OF BRELYNN E.
Cite as 30 Neb. App. 723

*Exception Hearing.*

Cindy argues that Brelynn was in the care of the State for more than 15 of the most recent 22 months before the State filed its petition and that she filed an exception because she needed more time to accomplish the goals contained within her case plan. She then argues she is entitled to a hearing on her motion for an exception under Neb. Rev. Stat. § 43-292.03(1) (Reissue 2016). Cindy is correct insofar as she argues that the statutory language of § 43-292.03(1) mandates a hearing. However, we find no prejudice to Cindy by the court's not having an exception hearing.

Briefly, we review the relevant statutory language regarding an exception hearing. Under subsection (1) of § 43-292.02, a petition shall be filed on behalf of the State to terminate the parental rights of a juvenile's parents if a juvenile has been in foster care under the responsibility of the State for 15 or more months of the most recent 22 months. Subsection (3) of § 43-292.02 provides that the petition is not required to be filed if the child is being cared for by a relative; the Department has documented in the case plan or permanency plan a compelling reason for determining that filing the petition would not be in the best interests of the child; or the family of the child has not had a reasonable opportunity to avail themselves of the services deemed necessary in the case plan or permanency plan approved by the court if reasonable efforts to preserve and reunify the family are required.

Section 43-292.03(1) states that within 30 days after the 15-month period under subsection (1) of section 43-292.02, the court shall hold a hearing on the record and shall make a determination on the record as to whether there is an exception under subsection (3) of § 43-292.02 in the particular case. If there is no exception, the State shall proceed as provided in subsection (1) of § 43-292.02.

[3-6] The Nebraska Supreme Court has explained that the purpose of an exception hearing is to determine whether the State may be excused from the mandatory requirement of

- 745 -

Nebraska Court of Appeals Advance Sheets
30 Nebraska Appellate Reports
IN RE INTEREST OF BRELYNN E.
Cite as 30 Neb. App. 723

§ 43-292.02(1) that it file a petition to terminate parental rights under certain circumstances. *In re Interest of Clifford M. et al.*, 261 Neb. 862, 626 N.W.2d 549 (2001). Under certain circumstances, the State is generally required to file a petition to terminate the parental rights of the child's parents, subject to the outcome of the exception hearing. See *id.* If the court determines that a statutory exception does not exist under § 43-292.02, then the State is required to file the petition. See *id.* However, if a statutory exception under § 43-292.01 exists, then the State is not required to file the petition but may do so anyway. See *id.* The Supreme Court further explained that a parent's due process rights are not deprived just because an exception hearing has not been held. See *id.* Instead, when there is a full opportunity to appear and present defenses at a hearing regarding the termination petition, a court does not deprive the parent's due process rights. The court found that although an exception hearing may afford a basis for relieving the State of its statutory obligation to file a petition to terminate parental rights, no language in either § 43-292.02 or § 43-292.03 prevents the State from petitioning to terminate parental rights. See *In re Interest of Clifford M. et al., supra*.

Cindy is correct insofar as there was no exception hearing in the present case despite the mandatory directive of the statute. However, the State may choose to file the termination petition after the 15-month period regardless of the outcome of the exception hearing. At the termination trial, the State presented evidence that Cindy was unable to make progress on her case plan goals despite the length of time the case was pending. The State also asserted that termination of Cindy's parental rights was appropriate because Cindy was unable to discharge her parental responsibilities due to her mental health or mental deficiencies. It is reasonable to infer that even if there was an exception hearing and an exception had been found, the State would have chosen to file the termination petition rather than allow Cindy additional time to work toward reunification. Additionally, because, in the present case, there was a full

- 746 -

Nebraska Court of Appeals Advance Sheets
30 Nebraska Appellate Reports
IN RE INTEREST OF BRELYNN E.
Cite as 30 Neb. App. 723

hearing on the termination petition and Cindy had an opportunity to appear and present defenses, Cindy's due process rights were not implicated. Therefore, we find no error in the court's decision not to hold an exception hearing.

*Investigator Amy's Testimony.*

Amy testified about the investigation that he and law enforcement conducted with respect to Kamdyn's death at Cindy's residence. Prior to his testimony, Cindy objected because the deputy county attorney prosecuting the case was married to Amy. Cindy asserted the doctrine of affinity and oneness as a basis for her challenge. The county court took the objection under advisement and allowed Amy to testify. Cindy later argued that the basis of her objection was that there was a conflict of interest in having the prosecuting attorney question her own husband. Cindy argued that Amy's testimony should have been stricken. The court found that the objection to the testimony of the witness was not a proper remedy; rather, the proper remedy would be a motion to disqualify the prosecutor. The court also noted that a motion to disqualify the prosecuting attorney was not made. As a result, the court overruled the motion to exclude Amy's testimony. On appeal, Cindy reiterates her argument that there was a conflict when Amy testified while married to the prosecuting attorney. She asserts that the court erred when it allowed Amy to testify. However, she now asserts in the alternative that the prosecuting attorney should have been recused.

The issue of whether the prosecuting attorney should have voluntarily recused herself is not properly before us. An appellate court will not consider an issue on appeal that was not presented to or passed upon by the trial court. *In re Guardianship & Conservatorship of J.F.*, 307 Neb. 452, 949 N.W.2d 496 (2020). The initial objection and the argument before the county court focused on whether the testimony was admissible. Only upon appeal does Cindy now argue that the prosecuting attorney should have recused herself from the case.

- 747 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
30 NEBRASKA APPELLATE REPORTS
IN RE INTEREST OF BRELYNN E.
Cite as 30 Neb. App. 723

Accordingly, we do not address whether there was error in that regard.

Cindy does not provide any case law to support her argument that Amy's testimony was inadmissible due to his relationship with the prosecuting attorney. Our review of the case law also does not reveal any authority on this issue. We focus on whether Cindy's due process rights were violated by allowing the testimony of Amy. On the record before us in this case, we cannot find that Cindy suffered prejudice based on the evidence adduced. Amy's testimony focused on the initial encounter with Cindy and an investigation of her residence following Kamdyn's death. This testimony was duplicative of evidence received in the form of the Department intake reports that were received which detailed the condition of the home and the events surrounding Kamdyn's death. In other respects, it was duplicative of the testimony of the pediatrician who testified about treating Kamdyn. Therefore, we do not find that Cindy was prejudiced by allowing Amy to testify.

We are troubled by the fact that the attorney called her husband to testify as a witness and more troubled by the fact that according to the prosecuting attorney's statements, this is not the first case where she has called her husband to testify. The Supreme Court has long held that there should not be anything in the way of private interest to possibly sway the judgment of a prosecutor in prosecuting persons whose guilt is so doubtful or to tempt him or her to depart from a disinterested and conscientious discharge of his or her duty. *Ress v. Shepherd*, 84 Neb. 268, 120 N.W. 1132 (1909). We also note that as early as 1993, an ethics advisory opinion for lawyers was issued stating that a county attorney whose spouse is a police officer should not personally prosecute any case in which his or her spouse will be called as a witness. See Neb. Ethics Adv. Op. No. 93-5 (1993). Given the prosecuting attorney's statements during the case that she has worked on many cases where her husband has testified, we note that it would be the better practice for the

- 748 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
30 NEBRASKA APPELLATE REPORTS
IN RE INTEREST OF BRELYNN E.
Cite as 30 Neb. App. 723

attorney to recuse herself in such cases in order to foreclose any questions of impropriety.

However, pursuant to the specific facts of this case, we do not find that there was any prejudicial error to Cindy by virtue of the court's decision to receive Amy's testimony. Therefore, we find this assigned error to be without merit.

*Statutory Grounds.*

[7] Cindy argues that the county court erred in finding the State proved by clear and convincing evidence that statutory grounds existed to terminate her rights. For a juvenile court to terminate parental rights under § 43-292, it must find that one or more of the statutory grounds listed in this section have been satisfied and that such termination is in the child's best interests. *In re Interest of Becka P. et al.*, 27 Neb. App. 489, 933 N.W.2d 873 (2019). The State must prove these facts by clear and convincing evidence. *Id.*

[8] The county court found that the State presented evidence to satisfy § 43-292(5), (6), and (7). Section 43-292(7) allows for termination when the juvenile has been in an out-of-home placement for 15 or more months of the most recent 22 months. It operates mechanically and, unlike the other subsections of the statute, does not require the State to adduce evidence of any specific fault on the part of a parent. *In re Interest of Becka P. et al., supra*. In a case of termination of parental rights based on § 43-292(7), the protection afforded the rights of the parent comes in the best interests step of the analysis. *In re Interest of Becka P. et al., supra*.

[9] Cindy concedes that Brelynn had been out of the home for 15 of the most recent 22 months at the time the motion to terminate parental rights was filed; nevertheless, she argues that an exception should be provided to the "'hard and fast'" calculation of the timeframe. Brief for appellant at 40. However, the proper application of § 43-292(7) consists of counting the most recent 22 months preceding the filing of the petition to terminate parental rights, followed by counting how many of

- 749 -

Nebraska Court of Appeals Advance Sheets
30 Nebraska Appellate Reports
IN RE INTEREST OF BRELYNN E.
Cite as 30 Neb. App. 723

those 22 months the child was in out-of-home placement. *In re Interest of Kindra S.*, 14 Neb. App. 202, 705 N.W.2d 792 (2005). Here, Brelynn was removed from Cindy's residence in November 2018. At no time was she returned to Cindy's care. The State filed its motion for termination of parental rights on March 11, 2020, and the termination trial was held between September 10 and December 10. When the motion for termination was filed, Brelynn had been out of the home for about 16 months. By the last day of trial, Brelynn had been out of the home for over 24 months. Accordingly, we find no error in the county court's determination that the State had proved the necessary elements of § 43-292(7).

[10] Section 43-292 provides 11 separate conditions, any one of which can serve as the basis for termination when coupled with the evidence that termination is in the best interests of the child. *In re Interest of Sir Messiah T. et al.*, 279 Neb. 900, 782 N.W.2d 320 (2010). Because we conclude that the State presented clear and convincing evidence that grounds to terminate existed under § 43-292(7), we need not address the other statutory grounds.

*Best Interests.*

[11] Cindy also argues that the county court erred in finding that it was in Brelynn's best interests to terminate Cindy's parental rights. In addition to proving a statutory ground, the State must show that termination of parental rights is in the best interests of the child. *In re Interest of Becka P. et al., supra.* A parent's right to raise his or her child is constitutionally protected; so before a court may terminate parental rights, the State must show that the parent is unfit. *Id.* There is a rebuttable presumption that the best interests of the child are served by having a relationship with his or her parent. Based on the idea that fit parents act in the best interests of their children, this presumption is overcome only when the State has proved that the parent is unfit. *Id.*

[12,13] The term "unfitness" is not expressly used in § 43,292, but the concept is generally encompassed by the

- 750 -

Nebraska Court of Appeals Advance Sheets
30 Nebraska Appellate Reports
IN RE INTEREST OF BRELYNN E.
Cite as 30 Neb. App. 723

fault and neglect subsections of that statute, and also through a determination of the child's best interests. *In re Interest of Kendra M. et al.*, 283 Neb. 1014, 814 N.W.2d 747 (2012). In the context of the constitutionally protected relationship between a parent and a child, parental unfitness means a personal deficiency or incapacity which has prevented, or will probably prevent, performance of a reasonable parental obligation in child rearing and which caused, or probably will result in, detriment to the child's well-being. *Id.*

[14] The best interests analysis and the parental fitness analysis are fact-intensive inquiries. And while both are separate inquiries, each examines essentially the same underlying facts. *In re Interest of Becka P. et al.*, 27 Neb. App. 489, 933 N.W.2d 873 (2019). In proceedings to terminate parental rights, the law does not require perfection of a parent; instead, courts should look for the parent's continued improvement in parenting skills and a beneficial relationship between a parent and a child. *Id.* In cases where termination of parental rights is based on § 43-292(7), the Supreme Court has held that appellate courts must be particularly diligent in their de novo review of whether termination of parental rights is in fact in the child's best interests. *In re Interest of Becka P. et al., supra.*

We first note that Brelynn has been removed from Cindy's care on three separate occasions, including the present case. Following Wesley's sexual abuse of Brelynn, Cindy voluntarily allowed removal of Brelynn from her residence. Despite the fact that Cindy believed Wesley was sexually abusing Brelynn, he continued to reside with Cindy for a period of time thereafter. Brelynn was removed the second time because there were concerns regarding an unsanitary home, Cindy was leaving Brelynn with inappropriate individuals, and Cindy was struggling with her mental health. Although the first two removals resulted in reunification, the same issues surfaced in the present case. Law enforcement reported an unsanitary home, including that there was medicine in reach of Brelynn and that the home smelled of feces and urine. One's history

- 751 -

Nebraska Court of Appeals Advance Sheets
30 Nebraska Appellate Reports
IN RE INTEREST OF BRELYNN E.
Cite as 30 Neb. App. 723

as a parent speaks to one's future as a parent, and past parenting outcomes should not be ignored. See *In re Interest of Sir Messiah T. et al.*, 279 Neb. 900, 782 N.W.2d 320 (2010).

The evidence demonstrated that Cindy continued to struggle with her mental health. She reported that she has been suffering auditory and visual hallucinations for more than 12 years and acknowledged recurring instances of deterioration requiring hospitalization. Although she believes that she is making progress in resolving her mental health issues, the county court found that she lacked credibility, and the remaining evidence, including the testimony of numerous mental health practitioners, showed that she continued to struggle. On appeal, we give weight to the fact that the lower court observed the witnesses and accepted one version of the facts over the other. *In re Interest of Lisa W. & Samantha W.*, 258 Neb. 914, 606 N.W.2d 804 (2000).

Cindy has been hospitalized over 20 times regarding her mental health issues, most recently in August 2020. These hospitalizations have occurred due to anxiety attacks and, more troubling, suicidal thoughts. The evidence at trial showed that following Kamdyn's death, Cindy's and Brelynn's mental health became linked. When Cindy would struggle with maintaining her mental health, Brelynn would likewise struggle. Cindy understood the importance of the principles that she learned in therapy but repeatedly struggled to implement these principles. Brelynn would act as a caregiver to Cindy during Cindy's periods of decompensation, a scenario not healthy for either Brelynn or Cindy.

The mental health struggles led to physical symptoms in Brelynn. Cindy's inability to have stability in her mental health led Brelynn to demonstrate controlling behaviors. These controlling behaviors included her being constipated to the point where she needed to be in the hospital for an invasive procedure. According to McCoy, if Brelynn had stability in her life, her controlling behaviors would abate. This is corroborated by the testimony of Brelynn's foster parents, who testified that

- 752 -

Nebraska Court of Appeals Advance Sheets
30 Nebraska Appellate Reports
IN RE INTEREST OF BRELYNN E.
Cite as 30 Neb. App. 723

Brelynn's controlling behaviors were tempered after not having visitations with Cindy. In addition, Cindy's mental health issues, including narcissism, led her to take Brelynn to doctor appointments more frequently than she should.

The testimony from the foster parents demonstrated that Brelynn has thrived while outside of Cindy's care. The foster parents testified that when they took Brelynn to doctor or dentist appointments without Cindy, Brelynn would not be anxious. It was only when Cindy also attended that Brelynn would become agitated about attending these appointments. After returning from visits with Cindy, Brelynn regressed in her ability to be toilet trained. She also returned from visits in dirty clothes or inappropriately dressed. Although different therapists testified that Cindy and Brelynn have a bond together, they also testified that Cindy struggled with being able to care for Brelynn or put Brelynn's needs above her own.

Not all of the evidence is negative toward Cindy. Evidence was adduced which demonstrated that Cindy made efforts toward self-improvement and in her parenting skills. Unfortunately, those efforts have not resulted in her becoming capable of being able to satisfy her parental obligations and provide for Brelynn's well-being on a consistent basis. The testimony of Cindy's caseworkers, counselors, and support workers established that Cindy would remain in need of significant assistance for an indeterminate period of time and that she was not appreciably closer to having the ability to meet her parental obligations as of the time of trial. At the time of trial, Brelynn had been out of the home for over 2 years. Children cannot, and should not, be suspended in foster care or be made to await uncertain parental maturity. *In re Interest of Jahon S.*, 291 Neb. 97, 864 N.W.2d 228 (2015). Termination of Cindy's parental rights, therefore, is in Brelynn's best interests, as it will prevent her from further languishing in foster care while awaiting Cindy's uncertain ability to attain the skills necessary for parental maturity.

- 753 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
30 NEBRASKA APPELLATE REPORTS
IN RE INTEREST OF BRELYNN E.
Cite as 30 Neb. App. 723

## CONCLUSION

Based on the foregoing, we conclude that the county court did not err by not holding an exception hearing or by receiving Amy's testimony. Since there was no request during the pendency of the case to have Brelynn placed with Gaedeke prior to termination of Cindy's parental rights, we do not address this assignment of error. We also conclude that the State proved that grounds for termination of her parental rights existed under § 43-292(7) and that their termination was in the best interests of Brelynn. Accordingly, we affirm the order of the county court.

AFFIRMED.