IN RE INTEREST OF CLIFFORD M. ET AL.,
CHILDREN UNDER 18 YEARS OF AGE.
STATE OF NEBRASKA, APELLEE, V.
SUZETTE M., APPELLANT.
626 N.W. 2d 549

Filed May 25, 2001.   No. S-00-699.

Stephanie Weber Milone for appellant.

James S. Jansen, Douglas County Attorney, and Karen Kassebaum Nelson for appellee.

HENDRY, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.

STEPHAN, J.

This is an action to terminate the parental rights of Suzette M., the biological mother of Clifford M., born February 17, 1990; Colette M., born February 1, 1992; and Chelsea M., born December 28, 1992. Following a hearing, the separate juvenile court of Douglas County, Nebraska, entered an order terminating the mother's parental rights, and she perfected this timely appeal. Finding no error, we affirm.

## I. BACKGROUND

This is the third appearance of this case in the appellate courts of Nebraska. On or about March 1, 1994, the three children were removed from their mother's home and placed in the temporary custody of the Department of Health and Human Services (DHHS) because of alleged abuse. All three have been in the custody of the same foster parents since March 18, 1994. On February 3, 1995, the juvenile court adjudicated the children as being within the meaning of Neb. Rev. Stat. § 43-247(3)(a) (Reissue 1993) on the basis of a second amended petition dated November 10, 1994. The adjudication was based upon the faults and habits of the mother. The juvenile court found that the mother had failed to protect Clifford from physical abuse perpetrated by her live-in boyfriend, T.C., and that all three children had been subjected to sexual contact by both the mother and T.C.

Initially, the mother was allowed to have one or two supervised visits with the children per week. Following the adjudication, the juvenile court entered a series of rehabilitation plans designed to bring about the eventual reunification of the family. Under one of those plans, adopted in 1996, the mother was ordered to enroll and participate in a program known as Parents United, which is designed to work specifically with sexual offenders and the victims of sexual abuse. Any person admitted into this program as an offender must first admit responsibility for the sexual abuse. In this case, the mother refused to acknowledge that any sexual contact occurred.

On March 27, 1997, following a hearing on a motion filed by the guardian ad litem, the juvenile court entered an order terminating the mother's parental rights to all three minor children pursuant to Neb. Rev. Stat. § 43-292(2) and (7) (Reissue 1993).

The order included a finding that "[d]ue to [the mother's] denial of the sexual contact to which she and [T.C.] subjected said children, she has effectively barred her participation in the children's therapy as ordered by this Court." The mother's visitation rights were discontinued at that time. The mother appealed, and the Nebraska Court of Appeals reversed the termination order, interpreting it as being based solely upon the mother's refusal to make the incriminating statements necessary to enroll in the Parents United program as a precursor to further participation in family therapy and holding that as such, it violated her Fifth Amendment privilege against self-incrimination. *In re Interest of Clifford M. et al.*, 6 Neb. App. 754, 577 N.W.2d 547 (1998). The Court of Appeals characterized its holding as limited to the principle that "courts may not *terminate* parental rights on the sole basis that a parent *refuses* to waive his or her right against self-incrimination" and further noted that the State was "not prejudiced from filing another motion to terminate [the mother's] parental rights on lawful grounds and presenting evidence to support such motion, if and when such action becomes appropriate." *Id.* at 774, 577 N.W.2d at 559.

Following remand, the juvenile court, in accordance with the mandate of the Court of Appeals, dismissed the first motion to terminate the mother's parental rights. On July 1, 1998, the State and the guardian ad litem filed another motion to terminate the mother's parental rights. The mother moved to dismiss and filed a separate motion to require the children, then in foster care, to be made available for visitation and family therapy. The juvenile court denied both motions, and the mother appealed. In *In re Interest of Clifford M. et al.*, 258 Neb. 800, 606 N.W.2d 743 (2000), we determined that we lacked jurisdiction because there was no final, appealable order and dismissed the appeal.

On December 28, 1998, the State and the guardian ad litem filed an amended motion for termination of parental rights. This motion sought termination under § 43-292(2) and (7) (Reissue 1998). The mother filed an answer on January 22, 1999, denying the allegations in the amended motion and asserting several affirmative defenses, including a claim that § 43-292(2) and (7) as amended by 1998 Neb. Laws, L.B. 1041, does not apply

retroactively and that the amended motion therefore violated her right to due process.

An evidentiary hearing on the amended motion for termination was held on May 23 and 24, 2000. Prior to taking any evidence, the juvenile court asked the mother whether she had seen the amended motion and understood the nature of the allegations. She responded that her lawyer had explained the allegations to her. The court then advised the mother that if the allegations in the amended motion were found to be true by clear and convincing evidence, her parental rights could be terminated. She was also informed of her right to an attorney, to remain silent, to confront and cross-examine witnesses, to compel the testimony of witnesses, to a speedy trial, and to appeal.

During the hearing, various exhibits were offered by both parties, several witnesses testified on behalf of the State, and the mother testified on her own behalf. We will discuss the substance of this evidence in conjunction with our analysis of the mother's specific assignments of error. In its order terminating parental rights, the juvenile court found by clear and convincing evidence that grounds for termination had been established under § 43-292(2) and (7) (Reissue 1998) and that termination of parental rights was in the best interests of the children.

## II. ASSIGNMENTS OF ERROR

The mother assigns, restated, that the juvenile court erred in (1) applying § 43-292(2) and (7) (Reissue 1998) retroactively; (2) finding clear and convincing evidence sufficient to terminate her parental rights under § 43-292(2) and (7) (Reissue 1998); (3) violating her due process rights by failing to hold an exception hearing prior to terminating her parental rights under § 43-292(2) and (7) (Reissue 1998); (4) violating her due process rights by failing to provide adequate notice of the nature and consequences of the proceedings and of the statutory provisions upon which termination was sought; (5) basing the termination of her parental rights upon § 43-292(2) and (7) (Reissue 1993), as those statutory sections have been amended; (6) finding clear and convincing evidence to support termination of her parental rights under § 43-292(2) and (7) (Reissue 1993); (7) determining that the termination of her parental rights is in the

best interests of the children; and (8) denying her motion to dismiss.

## III. STANDARD OF REVIEW

■ In an appeal from an order terminating parental rights, an appellate court tries factual questions de novo on the record. Appellate review is independent of the juvenile court's findings. However, when the evidence is in conflict, an appellate court may give weight to the fact that the juvenile court observed the witnesses and accepted one version of facts over another. *In re Interest of Kalie W.*, 258 Neb. 46, 601 N.W.2d 753 (1999).

## IV. ANALYSIS

### 1. INTRODUCTION

■ In order to terminate parental rights, the State must prove by clear and convincing evidence that one of the statutory grounds enumerated in § 43-292 exists and that termination is in the child's best interests. *In re Interest of Michael B. et al.*, 258 Neb. 545, 604 N.W.2d 405 (2000); *In re Interest of Kalie W., supra*. Here, the State alleged and the juvenile court determined that the statutory grounds set forth in § 43-292(2) and (7) were established. For the reasons outlined below, we conclude based upon our de novo review that there is clear and convincing evidence justifying termination of parental rights pursuant to § 43-292(2) (Reissue 1998), and we therefore limit our discussion to that issue.

### 2. RETROACTIVITY

The operative amended motion to terminate parental rights was filed in this case on December 28, 1998, after the date on which amendments to the Nebraska Juvenile Code enacted by the Nebraska Legislature in that year became operative. See 1998 Neb. Laws, L.B. 1041. As we noted in *In re Interest of Sarah K.*, 258 Neb. 52, 601 N.W.2d 780 (1999), the legislative history of L.B. 1041 indicates that it was necessitated by the terms of the federal Adoption and Safe Families Act of 1997, which mandated certain changes to state juvenile codes as a condition to continued federal funding of certain state programs, including foster care. See 42 U.S.C. § 671 (1994 & Supp. IV 1998). As a result of these amendments, § 43-292(2) provides

that parental rights can be terminated upon a showing that "[t]he parents have substantially and continuously or repeatedly neglected and refused to give the juvenile *or a sibling of the juvenile* necessary parental care and protection." (Emphasis supplied.) The addition of the italicized phrase was the only change made to § 43-292(2) by L.B. 1041. The language of the statute as amended in 1998 was utilized by the State in its amended motion for termination of parental rights and cited by the juvenile court in its termination order. The mother generally contends that this "retroactive" application of the amended statute deprived her of due process.

In noncriminal cases, substantive statutes are generally not given retroactive effect unless the Legislature has clearly expressed an intention that the new statute is to be applied retroactively. *Battle Creek State Bank v. Haake*, 255 Neb. 666, 587 N.W.2d 83 (1998). When determining whether new amendments to existing legislation can be applied retroactively, the critical question is whether the amendment is substantive or procedural, not whether the act or new legislation in its entirety is substantive or procedural. *Kratochvil v. Motor Club Ins. Assn.*, 255 Neb. 977, 588 N.W.2d 565 (1999). While substantive amendments generally are not applicable to pending cases, procedural amendments are. *Id.* A substantive right is one which creates a right or remedy which did not previously exist and which, but for the creation of the substantive right, would not entitle one to recover. *Id.* A procedural right, on the other hand, is considered simply to be the method by which an already existing right is exercised. *Id.* A substantive law creates duties, rights, and obligations, whereas a procedural law prescribes the means and methods through and by which substantive laws are enforced and applied. *Cheloha v. Cheloha*, 255 Neb. 32, 582 N.W.2d 291 (1998).

In this case, it is unnecessary to determine whether the 1998 addition of the phrase "or a sibling of the juvenile" to § 43-292(2) was a substantive or a procedural change to the statute because we are not presented with the question of whether parental rights can be terminated based upon abuse and neglect of a nonadjudicated sibling. Here, each of the children was adjudicated to be within the jurisdiction of the juvenile court, and

there is evidence that each child was subjected to abuse and neglect at the hands of the mother and T.C. Depriving an adjudicated juvenile of necessary parental care and protection was a statutory basis for terminating parental rights both prior and subsequent to the 1998 amendments to the juvenile code, and therefore the mother's contention that § 43-292(2) was applied "retroactively" by the juvenile court is without merit.

### 3. Sufficiency of Evidence

### (a) State's Evidence

Dr. Cynthia M. Wengel, formerly chief of the pediatrics department at Creighton Medical Center, testified with respect to colposcopic examinations which she performed on each of the children on October 7, 1994. This medical procedure involves the use of a magnification device to examine the genitalia and rectum in order to evaluate whether a child has been sexually abused. Wengel testified that during such an examination, it is not uncommon for children to spontaneously offer information. As she was examining Clifford, he mentioned that "[T.C.] put his wiener in my bottom." Clifford also volunteered that T.C. similarly subjected Colette and Chelsea to anal penetration when they were playing the "doctor game." Wengel testified that Clifford's examination was normal but that such examinations were often normal even when sexual abuse had actually occurred due to the body's ability to heal. Wengel further testified that her vaginal examinations of Colette and Chelsea were normal but that the rectal tissue of both girls showed evidence of prior tearing. Wengel testified that while constipation or trauma could cause tearing of rectal tissue, it was her opinion that the injuries to Colette and Chelsea were caused by sexual abuse.

Dr. Michael Moran, a board-certified pediatrician who reviewed the colposcopic examinations, testified that the negative clinical findings with respect to Clifford could not rule out the possibility that Clifford had been subjected to sexual abuse. Moran opined that both Colette and Chelsea had been sexually abused because the position of the rectal scarring was inconsistent with other causes of injury.

Kay McMahon, a licensed certified social worker and an expert in child sexual abuse, testified that she treated the three children from 1994 to 1998. At that time, the children were diagnosed as suffering from posttraumatic stress disorder, which McMahon explained occurs in persons who have suffered trauma outside the normal life experience. McMahon testified that her sessions with the children in 1996 occurred shortly after visits with their mother. She stated that they were often distraught after such visits. Clifford was more anxious, less able to maintain concentration, and more aggressive toward Colette and Chelsea after the visits. He reported that he "can't stop being scared" of the mother. Clifford was also afraid to sleep and vomited before and after visits with his mother. Colette cried and begged that the visits be stopped because she was dreaming of her mother at night and was scared. She also became more clingy' and regressed to "baby talk." Chelsea had nightmares and night terrors following visits with her mother. According to McMahon, the children's symptoms ended when the visits with their mother were discontinued and this sudden change demonstrated, in her opinion, that the mother was the cause of their anxiety.

McMahon was contacted about doing family therapy in 1996. In the initial meeting, the mother stated to McMahon that her family therapy goal was to find out why Clifford was lying about the sexual abuse. McMahon testified that she responded by explaining that Clifford clearly believed the abuse occurred and that being adversarial would not establish a positive therapeutic ground upon which to build. In McMahon's second meeting with the mother, the mother again accused Clifford of lying and refused to participate in further therapy with McMahon. McMahon testified that she refused to conduct family therapy under those circumstances because, in her opinion, Clifford would suffer extreme psychological damage by such confrontations with his mother. McMahon testified that all of the children wanted visits with their mother stopped and that it was in their best interests for the mother's parental rights to be terminated.

On cross-examination, McMahon admitted that she never observed the children interact with their mother. She further admitted that Clifford had stated that he loved his mother and

opined that it was possible that he was not being fully truthful in his allegations. McMahon also testified, however, that she had repeatedly questioned Clifford and that his reports of the abuse were always consistent. According to McMahon, the primary way to protect a young child from posttraumatic stress disorder is to remove the original source of trauma from the child's life.

The licensed foster mother who has cared for the children since March 1994 testified that the behavior of the children worsened after visits with the mother. The children would argue, become destructive, vomit, and have night terrors. Specifically, Chelsea had nightmares about someone in her bed after her toes or her private parts. The foster mother stated that the behavior improved as the contact with their mother decreased.

Clifford's deposition was admitted by stipulation of the parties. The deposition was taken on February 17, 1999, Clifford's ninth birthday. He testified that he lived with his mother when he was about 3 years old and that a man named "T.C." and Colette and Chelsea also lived with them. Clifford said he did not feel safe when he lived with his mother because of what she did to him. Clifford testified that while wearing rubber gloves, T.C. touched him on his "private parts," which he described as his "bottom" and his "front private part" which was "straight." He said the touching made him feel bad. Clifford testified that when T.C. touched his "front private," he smacked it around. T.C. called this "the doctor game." T.C. told Clifford to touch T.C.'s privates and Clifford complied. He described ejaculation by T.C. when Clifford touched T.C.'s "front private."

Clifford testified that his mother was in the room when T.C. engaged in this activity and that she touched Clifford in the same places and in the same manner as T.C. Clifford also touched his mother because she told him to do so. He said that he touched her front and back privates and her chest. Clifford said that his mother's front private part looked different than T.C's because it was not straight.

Clifford stated that he saw T.C. going "up and down, up and down" while he was touching Colette and both were naked. Clifford said that T.C. touched Colette with his "dick-ke-do" on her "dick-ke-do," which Clifford described as the same thing as a front private. Clifford said that his mother was present when

this occurred but that she did not say anything. She also did not say anything when T.C. was touching Clifford. Clifford said that he also observed T.C. engaging in the same type of activity with Chelsea, also in his mother's presence.

Dr. Cynthia Topf, a licensed clinical psychologist, testified that she visited with the children in 1994 and again in 1998. In 1994, Clifford spoke to her about the sexual abuse committed by his mother and T.C. Clifford told her that he had seen the two adults touch each other and also touch Chelsea and Colette. Clifford told Topf that he would "suck on dickey" and kissed his mother's "boobies." Clifford also discussed digital penetration and said he was forced to participate because his mother and T.C. told him not to tell or they would hit or hurt him. At that time, Topf diagnosed Clifford with posttraumatic stress disorder and found that Colette was also exhibiting symptoms. She recommended no visitation with the mother in 1994.

Topf reiterated this recommendation after meeting with the three children in 1998. Topf testified that in 1998, all three children exhibited very severe behavioral and emotional reactions at the thought of seeing their mother. Clifford began crying and said he did not want to see his mother. Chelsea had a bad dream, and Colette became very clingy and needy. Topf opined that these symptoms were an acute exacerbation of posttraumatic stress disorder. On cross-examination, Topf admitted that she did not observe the children interacting with their mother. She testified that she formed her 1998 opinion based upon the children's reports, her observations of the children, and the foster mother's reports of the children's behavior after visits with their mother. Topf testified that she scheduled six sessions with the children but ended her evaluation after one session with Colette and Chelsea and three sessions with Clifford because she thought it was too emotionally damaging for them to discuss their mother. In her opinion, forcing the children to talk about the trauma was not effective and treatment should begin only when the children were ready to bring up the trauma on their own.

Deniz Leuenberger, an employee of DHHS, became the case manager in this matter in July 1998. She met with the three children in August. When she questioned the children about their

mother, they talked about their foster mother. When asked whether they had another mother, the children referred to the "visit mom" and did not know her name. Leuenberger testified that the children became noticeably agitated when talking about their "visit mom."

In 1999, Leuenberger concluded that she could not implement a safety plan for this family because the history of sexual abuse required the mother to obtain help or to at least acknowledge that the children believed that they had been abused and were frightened because of it. Leuenberger testified that the mother could not acknowledge the children's feelings and that there was no party that could protect the children. Leuenberger stated her opinion that the mother's parental rights should be terminated because of this inability to formulate a safety plan, the children's resistance to reunification, and the uncertainty faced by the children during their extended stay in foster care.

On cross-examination, Leuenberger admitted that she saw the children for 1½ hours in August 1998 and 2 hours in February 1999. She had one or two meetings and a couple of telephone contacts with the mother. She did not observe the mother interact with the children, and no family therapy was conducted because the children resisted it.

Leuenberger testified that 24-hour supervision of the children in their mother's home was not a reasonable service to offer and that even if offered, it would not reduce the risk enough to provide the children with safety. She testified that DHHS would not force a child to visit his or her parent and would not force a child to participate in therapy.

### (b) Mother's Evidence

The mother testified on her own behalf. Her testimony focused primarily upon her efforts at reunification with her children. She stated that she was not made aware of many of the case plans in her case. She understood that the goal of the court's orders was reunification of her family, and she therefore tried to comply with the orders. She obtained housing, obtained a legal income, began learning to read, and attended a domestic violence course on her own. She completed psychiatric evaluations that were requested of her and lined up her own doctors and therapists

without assistance from DHHS. The mother testified that she requested family therapy and that she understood after her first meeting with McMahon that the children would be at the second meeting. When the children were not present at the second meeting, she informed McMahon that she already had an individual therapist and walked out. She testified that she never missed a visit with her children. She expressed concern about the manner in which DHHS transported the children to visits because Colette and Chelsea were not in car seats and Clifford was riding in the front seat of a car equipped with an airbag. The mother testified that she terminated her relationship with T.C. in 1995 and is willing to participate in family and individual therapy. She denied being informed that there was no point in attempting to comply with the other portions of the court's orders if she refused to admit the abuse. The mother testified that she has done everything asked of her by the court and DHHS.

On cross-examination, the mother admitted that DHHS accepted all of the services she obtained on her own as a fulfillment of the court's orders and that DHHS paid for at least a portion of the services she obtained. She testified that she receives Social Security disability benefits "probably" for her mental health due to her depression and anxiety, but that raising three kids would not be stressful. She denied telling McMahon that she wanted to confront Clifford about why he was lying. She testified that she understood the family therapy was first to be individually and then with the family. She thought it was in the best interests of the children to be with her and that they could be treated with counseling. The mother stated that she needed the children to be made available by DHHS for family therapy. She further testified that she did not trust McMahon's diagnosis of posttraumatic stress disorder and that such diagnosis would have to be made in writing by someone she could trust.

The mother testified that she has never admitted or denied Clifford's account of the alleged sexual abuse. She stated that criminal charges which were pending against her in 1995 had been dismissed. She testified that she does not understand why the State is seeking to terminate her parental rights and believes that it is in the best interests of her children to be with her. She requested 24-hour supervised visitation with her children.

(c) Resolution

The mother argues that the foregoing fails to establish by clear and convincing evidence that termination of her parental rights was appropriate pursuant to § 43-292(2). In addition, she argues the evidence is insufficient to support a finding that termination of her parental rights is in the best interests of the children. We disagree with both arguments.

Our independent review of the record leads us to conclude that Clifford truthfully described repeated acts of sexual abuse perpetrated upon the three children by T.C. with the mother's knowledge, and by the mother herself, before the children were removed from the mother's home. The events Clifford described to Wengel in 1994, at the age of 4, are consistent with his deposition testimony given 5 years later on his ninth birthday. Wengel, Moran, McMahon, and Topf, each of whom testified that he or she has experience and expertise in the detection and treatment of sexual abuse of children, all testified that they found Clifford's account to be credible. The testimony of McMahon in this regard is particularly persuasive. When asked on cross-examination by counsel for the mother how McMahon determined whether Clifford was lying, she responded as follows:

Okay. It is one of the things I have been specially trained in. One never wants to assume an allegation of abuse, especially sexual abuse, is true. It is traumatizing to the child and to the alleged offender. I, therefore, look for several things when I ask children. I ask — I look for over time is there consistency in their story? Is the general outlines [sic] of the story consistent over time? In this case that was true.

Secondly, is the general outlying of the case and the allegations so consistent that it's almost identical, in other words, like a rehearsed thing the child can't take something out of the full context and just talk about one piece, you know. In this case Clifford could talk about aspects without other — talk about other aspects at any given time, in other words, did not feel or seem to be a rehearsed kind of report.

The third thing you look for is if you throw in what would be or seem an extenuating question off the wall, can the child answer it. In other words, if a child has been rehearsed to report, for instance, sexual abuse and you

asked them what room it was in, they can usually tell you, in the bedroom. What color was the bedspread? A child who has been rehearsed is not going to be able to answer. That question really throws them. A child who has will look at you like that's a stupid question, but they pretty well answer it.

Over the course of many months, I would do all three lines of questioning, and Clifford consistently was able to convince me, in my professional opinion, that he was telling me the truth.

Further, it is undisputed that the colposcopic examination of Colette and Chelsea revealed rectal scarring consistent with sexual abuse.

The mother argues, however, that her parental rights should not be terminated because she has taken substantial steps to comply with the rehabilitation plans formulated by the juvenile court and that the reunification has been thwarted by the refusal of DHHS to permit even supervised visitation with her children since 1997. With respect to the reunification plan, we have consistently held that a juvenile court has broad discretion to formulate a postadjudication rehabilitation plan with a goal of reuniting the child with the parent. *In re Interest of Joshua M. et al.*, 251 Neb. 614, 558 N.W.2d 548 (1997). However, termination of parental rights under § 43-292(2) does not require proof that a parent has failed to comply with a rehabilitation plan. *In re Interest of S.B.E. et al.*, 240 Neb. 748, 484 N.W.2d 97 (1992). Although failure to achieve reunification pursuant to such a plan is a separate and independent ground for termination of parental rights pursuant to § 43-292(6), see *In re Interest of Kassara M.*, 258 Neb. 90, 601 N.W.2d 917 (1999), that has not been alleged in this case. Therefore, we will consider the potential efficacy of the rehabilitation plan only in the larger context of whether termination of parental rights, as opposed to efforts to reunify the family, is in the best interests of the children, as discussed below.

With respect to visitation, the record demonstrates that DHHS has not permitted the mother to have supervised visitation with her children since 1997. There is undisputed evidence in the record, however, that it would be emotionally and psy-

chologically damaging for the children to have contact with
their mother. It is also undisputed that the children do not wish
to have contact with the mother and that DHHS will not force
children to visit their parents. Moreover, we conclude from our
review of the record that the State and/or the guardian ad litem
have been seeking termination of the mother's parental rights
during approximately the same time period in which the mother
has been denied visitation with her children.

There is no evidence in the record to refute or cast serious
doubt upon Clifford's description of what occurred in his
mother's home. The record clearly and convincingly establishes
that the mother continuously or repeatedly neglected and
refused to give each of these three children necessary care and
protection, and therefore grounds for termination pursuant to
§ 43-292(2) have been established. We therefore turn to the
question of whether the evidence establishes that termination of
parental rights would be in the best interests of the children.

A juvenile's best interests are a primary consideration
in determining whether parental rights should be terminated as
authorized by the Nebraska Juvenile Code. *In re Interest of
Sunshine A. et al.*, 258 Neb. 148, 602 N.W.2d 452 (1999). The
right of parents to maintain custody of their child is a natural
right, subject only to the paramount interest which the public
has in the protection of the rights of the child. *In re Interest of
Kelley D. & Heather D.*, 256 Neb. 465, 590 N.W.2d 392 (1999).
The integrity of the family unit is one of the fundamental rights
guaranteed by the Constitution of the United States, and such
rights should not lightly be alienated. *In re Interest of Joshua M.
et al.*, 256 Neb. 596, 591 N.W.2d 557 (1999).

As noted above, we consider the potential efficacy of the
reunification plan in our analysis of whether termination of the
mother's parental rights is in the best interests of the children.
Based upon our independent review of the record, we conclude
that there is no substantial likelihood that these children can ever
be reunited with their mother pursuant to a rehabilitation plan.

The record clearly reveals that the children have a profound
negative reaction to personal contact with their biological
mother. McMahon testified that when she began seeing the chil-
dren in 1996, they became distraught and aggressive and

exhibited various other symptoms of posttraumatic stress disorder after visiting their mother. All three children told McMahon that they wanted the visits stopped. The symptoms suddenly subsided when visitation was discontinued in 1997, leading McMahon to conclude that contact with the mother reminded the children of the abuse they had experienced and produced the symptoms of anxiety. McMahon testified that the primary method of protecting a young child from posttraumatic stress disorder is to remove the original source of the trauma.

In a similar vein, Topf testified that when she saw the children in 1998, they exhibited very severe behavioral and emotional reactions to even the thought of seeing their mother. These symptoms included crying, destructive behavior, simulation of oral sex, nightmares, masturbation, and emotional regression. Topf eventually canceled scheduled evaluation sessions with the children because she felt it was too emotionally damaging for them to be reminded of what they had experienced.

The record thus reflects that the sexual abuse inflicted upon these children early in their lives has opened an emotional and psychological chasm between them and their mother which is unlikely to be bridged. The abuse has damaged the familial relationship beyond repair, and termination of the mother's parental rights is therefore in the best interests of the children.

### 4. ADEQUACY OF NOTICE

The mother argues that the juvenile court violated her right to due process by failing to give her notice of changes to § 43-292 brought about by the passage of L.B. 1041 in 1998. Specifically, she contends that "[t]here is nothing in the record to show [the mother] was provided adequate and sufficient notice of the possibility that her parental rights could be terminated under a new version of the law which was not in existence when this case began nor for almost four years thereafter." Brief for appellant at 29. As noted in our previous discussion, termination of the mother's parental rights was justified on the grounds set forth in language contained in § 43-292(2) before and after the 1998 amendment.

Notice to parents in juvenile proceedings to terminate parental rights is governed by Neb. Rev. Stat. § 43-279.01

(Reissue 1998), which was not changed by the 1998 amendments to the juvenile code. Section 43-279.01(1)(a) requires the court to advise a parent or custodian of the "[n]ature of the proceedings and the possible consequences or dispositions" as well as various procedural rights. The record reflects that prior to the May 23, 2000, hearing on the amended motion to terminate parental rights, the court gave each of the advisements required by § 43-279.01. The mother affirmatively stated that her attorney explained the allegations of the operative motion to her and that she understood her parental rights could be terminated if the allegations were proved by clear and convincing evidence. We conclude that the mother was given the notice to which she was entitled by statute and due process of law and reject her argument to the contrary.

### 5. FAILURE TO CONDUCT § 43-292.03 HEARING

The mother argues that her due process rights were violated by the failure of the juvenile court to conduct an exception hearing pursuant to Neb. Rev. Stat. § 43-292.03 (Reissue 1998), which was added to the juvenile code by 1998 Neb. Laws, L.B. 1041, and became operative on July 1, 1998. Section 43-292.03 must be read in conjunction with Neb. Rev. Stat. § 43-292.02 (Reissue 1998), which was also added to the juvenile code by the enactment of L.B. 1041. In pertinent part, § 43-292.02 provides:

(1) A petition shall be filed on behalf of the state to terminate the parental rights of the juvenile's parents or, if such a petition has been filed by another party, the state shall join as a party to the petition . . . if:

(a) A juvenile has been in foster care under the responsibility of the state for fifteen or more months of the most recent twenty-two months; . . .

. . . .

(3) The petition is not required to be filed on behalf of the state or if a petition is filed the state shall not be required to join in a petition to terminate parental rights . . . if:

. . . .

(c) The family of the juvenile has not had a reasonable opportunity to avail themselves of the services deemed necessary in the case plan or permanency plan approved by

the court if reasonable efforts to preserve and reunify the family are required under section 43-283.01.

Section 43-292.03 provides in part:

> (1) Within thirty days after the fifteen-month period under subsection (1) of section 43-292.02, the court shall hold a hearing on the record and shall make a determination on the record as to whether there is an exception under subsection (3) of section 43-292.02 in this particular case. If there is no exception, the state shall proceed as provided in subsection (1) of section 43-292.02.

The record does not indicate that the juvenile court ever conducted an "exception" hearing pursuant to § 43-292.03(1), despite the mandatory directive of the statute. However, it does not logically follow that the mother was thereby deprived of due process. The purpose of an exception hearing, derived from the plain language of § 43-292.03(1), is to determine whether the State may be excused from the mandatory requirement of § 43-292.02(1) that it file a petition to terminate parental rights under certain circumstances, including those where a juvenile has been in foster care under the responsibility of the State for 15 of the most recent 22 months. The State is not *required* to file a petition to terminate if the juvenile court determines at the exception hearing that any of the circumstances specified in § 43-292.02(3) exist. If such circumstances are not shown, § 43-292.03(1) provides that "the state shall proceed as provided in subsection (1) of section 43-292.02," which requires the filing of a petition to terminate parental rights under specified circumstances. While an exception hearing may afford a basis for *relieving* the State of its statutory obligation to file a petition to terminate under § 43-292.02(1), we find no language in either § 43-292.02 or § 43-292.03 which would *prevent* the State from petitioning for termination of parental rights under § 43-292 even if it were not required to do so.

The filing of a petition to terminate parental rights in this circumstance did not deprive the mother of due process because she retained a full opportunity to appear and present defenses at the hearing on the petition and to obtain judicial review of an adverse determination. Accordingly, this assignment of error is without merit.

## V. CONCLUSION

For the reasons discussed above, we conclude on the basis of our independent review that the State and the guardian ad litem have established by clear and convincing evidence that there is a factual basis for termination of the mother's parental rights under § 43-292(2) (Reissue 1998) and that termination of such rights is in the best interests of each of the three adjudicated juveniles. We also determine that the procedures utilized by the juvenile court in terminating the mother's parental rights did not deprive her of due process. Accordingly, the judgment of the separate juvenile court terminating the mother's parental rights with respect to each of the three children is affirmed.

AFFIRMED.