IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

IN RE INTEREST OF IMANI M.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

IN RE INTEREST OF IMANI M., A CHILD UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE,

V.

ANTUNASHEAKA M., APPELLANT.

Filed May 21, 2024.    No. A-23-769.

Appeal from the Separate Juvenile Court of Sarpy County: JONATHON D. CROSBY, Judge. Affirmed.

Jennifer A. Thompson for appellant.

Andrew T. Erickson, Deputy Sarpy County Attorney, for appellee.

PIRTLE, Chief Judge, and RIEDMANN and BISHOP, Judges.

RIEDMANN, Judge.

## I. INTRODUCTION

Antunasheaka M. appeals from the order of the juvenile court of Sarpy County terminating her parental rights to her daughter, Imani M. Antunasheaka assigns numerous errors. Following our de novo review, we affirm the judgment of the juvenile court.

## II. BACKGROUND

### 1. PROCEDURAL HISTORY

Imani was born in May 2015. She was removed from Antunasheaka's home in December 2021 following an incident where Imani came to school late, had tear stains on her face, and said she was sad. A teacher reported that when Imani was asked why she was sad, Imani "said her mom choked her because she had a potty accident" and that "Imani said it was hard to breathe." The

teacher also reported that Imani stated that her mom had hurt her for potty accidents before this. Imani was removed from Antunasheaka's care due to these allegations and has remained in out-of-home placement ever since.

Imani was adjudicated in May 2022. In May 2023, the State filed a motion for termination of parental rights, alleging that Imani came within the meaning of Neb. Rev. Stat. § 43-292(2) (Reissue 2016), in that Antunasheaka had substantially and continuously or repeatedly neglected and refused to give Imani necessary parental care and protection, that Imani came within the meaning of § 43-292(5), in that Antunasheaka was unable to discharge parental responsibilities because of mental illness or mental deficiency and there were reasonable grounds to believe that such condition would continue for a prolonged indeterminate period, and that Imani fell within the provisions of § 43-292(7) in that she had been in out-of-home placement for 15 or more of the most recent 22 months.

In June 2023, Antunasheaka filed a motion for unsupervised parenting time. The hearing on the motion was held August 9, one day before the termination hearing was scheduled. Rather than call her witnesses 2 days in a row, the transcript of the testimony in support of the motion for unsupervised visitation was entered into evidence at the termination hearing.

Imani has remained in the custody of the Nebraska Health and Human Services (DHHS) and in out-of-home placement since her removal in December 2021. From December 2021 to June 2022, there was no visitation between Antunasheaka and Imani because the county court presiding over Antunasheaka's criminal case, stemming from the abuse allegations here, had ordered no contact between the two. Antunasheaka eventually pled to a misdemeanor charge of child abuse and was placed on probation.

Heidi Von-Baruth, a child and family services specialist with DHHS, began managing Imani's case in April 2022. During her time supervising Imani's case, Von-Baruth completed referrals for family support workers, visitation companies, a co-occurring evaluation, and provided gas vouchers; she could not recall if she personally made a referral for a psychological and parenting assessment, but that referral was made.

A June 2022 court order required Antunasheaka to participate in family support as arranged by DHHS, cooperate with individual therapy as arranged by DHHS, abstain from all mood altering chemicals unless prescribed by a physician, secure safe and stable housing for herself and Imani, report any law enforcement contact within 24 hours, have reasonable rights of supervised visitation with Imani pending the criminal court order, notify DHHS of a change of address or phone number within 48 hours, complete a medication management appointment to address any ongoing mental health concerns, and complete Level 1 outpatient treatment as arranged by DHHS. A court order filed September 21, removed the requirement that Antunasheaka complete outpatient treatment and added the requirement that she complete her psychological and parenting assessment as arranged by DHHS. It also amended the portion of the order regarding visitation, ordering that Antunasheaka have reasonable rights of supervised parenting time with Imani, with higher and lower levels of visitation to be left up to the discretion of DHHS. The rest of her goals remained the same.

In April 2023, the juvenile court ordered Antunasheaka to cooperate with individual therapy as arranged by DHHS, refrain from the use of mood-altering chemicals unless prescribed, secure safe and stable housing for herself and Imani, report law enforcement contact within 24

hours, have reasonable rights of supervised parenting time with levels of higher and lower visitation left up to the discretion of DHHS, complete a medication management appointment to address any ongoing mental health concerns, and to participate in mediation to address permanency.

The evidence at the termination hearing focused on the court-ordered requirements of cooperating with individual therapy, refraining from mood-altering chemicals unless prescribed, securing safe and stable housing, having reasonable rights of supervised parenting time with levels of higher and lower visitation left up to the discretion of DHHS, completing a medication management appointment, participating in family support services, and completing a psychological and parenting assessment. Two DHHS employees, a psychologist, three therapists, a visitation worker, a family support specialist, and employees of the center where Antunasheaka was residing at the time of the hearing all testified at the hearings.

### 2. Court Ordered Goals

#### (a) Individual Therapy

In a September 2022 court report, Roni Hyde, Antunasheaka's therapist at the time, reported that little progress had been made because Antunasheaka had been angry during sessions and most of the time was spent trying to calm her. In January 2023, Hyde discharged Antunasheaka for missing appointments and because Hyde believed Antunasheaka

> returned to old habits after she had court. She decline[d] to address trauma, her mental health and [was] resistant to sharing that [sic] she perceives would "look bad at court". She continue[d] to blame others and is continuing to be paranoid. She has returned to be hostile and angry and directing it toward this worker and CPS. She does not feel she has anything else to work on.

Antunasheaka began seeing Cynthia Cusick for individual therapy in February 2023. Cusick testified that Antunasheaka reported that she stopped seeing Hyde because "it wasn't working out." Cusick had never spoken with Hyde.

Cusick reported that Antunasheaka had made progress in therapy, and that she has been able to identify her own particular issues, stressors, and strengths. When asked if Antunasheaka had taken accountability for the abuse she inflicted on Imani, Cusick stated that Antunasheaka had "taken accountability for her past." When asked if Antunasheaka had specifically addressed the strangulation reported by Imani, Cusick said that Antunasheaka had, and that "we've discussed it." However, she clarified "[w]e have not discussed strangulation. We have discussed her daughter and her past situation." Cusick confirmed that one of the therapeutic methods being utilized was stress reduction, which included stable housing. Cusick was not aware that at the time the abuse occurred, Antunasheaka had stable housing.

#### (b) Mood Altering Chemicals

There was evidence presented, which will be discussed more fully below, that Antunasheaka had not had any positive tests for controlled substances.

### (c) Safe and Stable Housing

The September 2022 court report noted that Antunasheaka was facing eviction from her apartment because she got into a fight with a neighbor and threw a paper towel which had been set on fire at the neighbor's door. Antunasheaka was evicted from her apartment in late September, but DHHS secured housing for her at the Stephen Center. A January 2023 court report noted that Von-Baruth had provided Antunasheaka names and numbers for shelters, but that Antunasheaka did not take the initiative to identify safe and stable housing. As will be discussed more fully below, at the time of the termination hearing Antunasheaka was residing in apartments at the Stephen Center.

### (d) Supervised Visitation

The September 2022 court report reflects that visitation had started between Antunasheaka and Imani, and Imani had experienced some ongoing struggles. Since visitation began, Imani's behaviors, such as tantrums, running away, and destroying items, had increased. The foster mother reported after a visit in August, Imani stated that "this is all my fault." When asked to explain, Imani stated that it was her fault that she was in foster care and that it never would have happened if she had listened; Imani reported Antunasheaka told her this. A July email from Imani's foster mother described an instance where Imani was angry after being told she would lose certain privileges for misbehavior, and Imani put her hands around her foster mother's neck and squeezed tightly.

A January 2023 court report noted that Imani had been diagnosed with post-traumatic stress disorder. But Imani had been placed on an individualized education plan which had helped her substantially. The visitation supervisor reported that at visits in September and October 2022, Antunasheaka grabbed Imani's arm and "yanked her in an angry, aggressive manner," shoved Imani, disengaged with the visitation worker after re-direction, and threatened the visitation worker. But visitation reports from November and December were much improved. Although during one visit, sometime after Antunasheaka began residing at the Stephen Center, but before moving into its apartments, Imani was quiet and would not talk, and Antunasheaka left the visit.

Visitation notes state that in March 2023, Imani reported to her foster mother that Antunasheaka instructed Imani to scream and cry and throw a fit about leaving visits so that Imani would get to come home sooner. The visitation worker present at Antunasheaka's visitation with Imani testified that from October 2022 to July 2023, Antunasheaka's issues with controlling her emotions or withdrawing from Imani had not completely resolved.

A June 2023 addendum to an April court report noted that at a recent visit, Antunasheaka became very upset and started crying, saying in front of Imani that she did not want to lose Imani. This behavior upset Imani and she began experiencing bed wetting and nightmares, which she had not shown in some time. Antunasheaka stated that she did not know that her behavior would impact Imani in that way. The addendum also noted that Antunasheaka did not take much of an interest in Imani's education the past year, and that she did not participate in parent-teacher conferences nor had she reached out to any teachers to see how Imani was doing in school.

Imani's therapist reported that Imani initially could not tolerate a conversation regarding Antunasheaka, and that while she can now have a conversation for a short time, it is still limited to a couple of minutes before Imani changes the topic. The therapist stated that the conversations

still seemed uncomfortable. Imani's therapist believed Imani had an adjustment disorder, but Imani later underwent further evaluation with another organization that stated a diagnosis of post-traumatic stress disorder should be considered. Imani's therapist hypothesized that the unwillingness to discuss her mother might stem from Imani worrying about what might happen if she discussed Antunasheaka, that Imani worried a lot, and it could also be that she was avoiding the discussion because it was too painful or triggering. Imani also avoided triggers around her removal from Antunasheaka and what Imani referred to as "whoopings" by her mother.

A family therapist who had conducted sessions with Antunasheaka and Imani beginning in June 2023 testified that she believed the two had a bond, and that Imani did not appear fearful. She had only completed three sessions with Antunasheaka and Imani. The first two sessions were 35 to 45 minutes long, and the last session was close to an hour.

### (e) Medication Management

Antunasheaka reported in July 2022 that she did not, and would not, take medication to address her mental health because it affected her personality. In her parenting and psychological assessment in November, Antunasheaka stated that she was taking medication for ADHD and depression. A January 2023 progress note indicated that Antunasheaka had taken psychotropic medications in the past but had stopped taking a certain medication due to side effects. At the time of the termination hearing, Von-Baruth had not received verification of Antunasheaka's medication management despite having requested it from her. Von-Baruth tried to contact the treating physician but was unsuccessful. Von-Baruth believed that Antunasheaka had stated at a family team meeting that she would need to sign a release prior to Von-Baruth being able to speak with the physician, but she did not believe one had been signed. Cusick had never spoken with the physician that provided medication management for Antunasheaka.

### (f) Family Support Services

A September 2022 court report noted that one family support worker informed DHHS about a September incident where Antunasheaka "blew up on her and shut down" due to the worker providing feedback and solutions that Antunasheaka did not like. But Antunasheaka later apologized and resumed sessions. A January 2023 court report noted that Antunasheaka had initially engaged in family support services and was at first receptive to examining her behavior. But the report noted that as time wore on Antunasheaka became increasingly disengaged and missed several appointments, and that she refused to accept responsibility for her actions. The report noted that there continued to be concerns about Antunasheaka's ability to safely parent Imani, and that while she had made fair progress, she continued to disengage when faced with addressing her behaviors.

Benjamin Roberts worked with Antunasheaka as a family support worker beginning in October 2022, and he had last met with her in December. In January 2023, Roberts noted that he believed his documentation "would suggest a consistent pattern of Antunasheaka's engagement until challenged followed then by avoidance, resistance, and disengagement." Roberts also stated that his "primary concern is Antunasheaka's pattern of narrative control of manipulation, use of violence and attitudes towards it, and response to challenges and/or push back on these beliefs or

behaviors." In February 2023, Antunasheaka was unsuccessfully discharged from family support services.

(g) Psychological and Parenting Assessment

Theodore DeLaet, a psychologist, evaluated Antunasheaka, meeting with her in November and December 2022. During the evaluation, Antunasheaka described the circumstances that led to Imani's removal. Antunasheaka reported that she and Imani both overslept and when they woke up, Antunasheaka was "anxious" and grabbed Imani's shirt, and Imani's shirt had tear stains from crying. DeLaet reported that Antunasheaka "was suspicious of what Child Protective Services told her, claiming that her daughter doesn't use words like suffocate or strangle and believes that others might have used words that her daughter didn't." He also noted that Antunasheaka "believe[d] that 'Project Harmony was biased and leading' in their questions."

DeLaet noted that Antunasheaka reported her attorney talked her into entering a plea to a misdemeanor charge in the criminal case, but she had wanted to fight it. Antunasheaka stated Imani has had trauma, and when asked the source of the trauma, stated that it was "from being removed from [her] care and being placed in foster care." She reported only mild problems with emotional self-regulation. Antunasheaka stated that she was taking medication for ADHD and depression.

DeLaet concluded that Antunasheaka was at moderate to moderate-high risk to engage in future child maltreatment, with child abuse of her daughter being the most likely form of future maltreatment. He diagnosed Antunasheaka with unspecified bipolar disorder, which he said was often characterized by poor compliance, significant mood swings, and aggression/anger control problems.

DeLaet created an addendum to his report, and reviewed additional information, such as police reports from before his interviews with Antunasheaka in 2022, guardian ad litem reports from March 2023, as well as letters of support for Antunasheaka. At the conclusion of the addendum, DeLaet determined that nothing he reviewed changed his initial report. He stated that the problems, such as unsuccessful discharges from programs, were suggestive of an ongoing problem and not of problems that were being resolved or managed well.

3. ANTUNASHEAKA'S WITNESSES

Antunasheaka presented the testimony of employees from the Stephen Center who had been working with her since October 2022. LaDell Maple testified that the Stephen Center had a homeless shelter, a treatment facility, and supportive housing. At one time, Maple had served as Antunasheaka's case manager for the Stephen Center. Antunasheaka had moved from the homeless shelter into supportive housing, and she resided in the apartments at the center; it was unclear from the testimony whether Antunasheaka had moved into these apartments in March or May 2023. Maple explained that the apartment would be able to accommodate a child and would typically be available for 18 months. During the program, participants must complete drug testing and apartment inspections.

Maple had observed Antunasheaka and Imani during visits, and believed they loved each other and had "a good balance of mother and child." Maple had participated in family team meetings for this case, and she felt that there was a division between Antunasheaka and DHHS. She believed that DHHS employees were trying not to acknowledge the changes and growth

Antunasheaka had made. Maple felt that DHHS just wanted to dwell on what brought Antunasheaka to the situation instead of focusing on the fact that she was taking steps to correct it.

Another Stephen Center employee testified that Antunasheaka had never tested positive for any illegal substance. She stated that Antunasheaka had attended some programming at the center, and that she had progressed very well since moving into the permanent supportive housing. This employee confirmed that the permanent supportive housing was a highly structured environment for a person living in it, and that it is not "permanent" permanent, but "permanent for the time being." Brian Doyle, who managed the permanent supportive housing, testified that he believed Antunasheaka was extremely hard working and followed every rule; he stated he had never heard a negative thing about her. In March 2023, Doyle wrote a letter of support for Antunasheaka. Doyle also felt that DHHS employees did not acknowledge any of the progress Antunasheaka had made.

### 4. DHHS RECOMMENDATIONS

Von-Baruth did not believe it was in Imani's best interests to be reunified with Antunasheaka. Von-Baruth felt that Antunasheaka had not accepted responsibility for what happened to Imani regarding the abuse, and that if a person did not admit there was a problem, then the problem cannot be fixed. Von-Baruth felt that Antunasheaka was still struggling to appropriately parent and redirect Imani, that currently Antunasheaka had a safety net, but she was worried about what would happen when that was gone. While Von-Baruth believed there was a bond between Antunasheaka and Imani, she did not believe that the bond negated the risk of potential harm to Imani.

### 5. JUVENILE COURT ORDER

The juvenile court found the testimony of DeLaet, Roberts, the two DHHS employees, the visitation worker, and Imani's therapist to be probative, credible, reliable, and entitled to weight. Ultimately, the juvenile court concluded that Antunasheaka had not taken responsibility for the physical abuse of Imani, nor had she recognized the impact the abuse had. It also stated that Antunasheaka had mental health issues that she had not adequately addressed. The juvenile court acknowledged that Antunasheaka had recently made efforts and limited progress but stated that Imani was long overdue for permanency and stability. It terminated Antunasheaka's parental rights. It also denied her request for unsupervised visitation and for visitation pending the appeal. Antunasheaka appeals.

### III. ASSIGNMENTS OF ERROR

Antunasheaka assigns that the juvenile court erred in (1) failing to find that an exception existed under Neb. Rev. Stat. § 43-292.02 (Cum. Supp. 2022) which triggered the State to file a termination of her parental rights and also used the wrong standard under (3)(c) of the statute; (2) giving the control of visitation to DHHS instead of relying on the facts and making its own decisions and order; (3) not setting a timely hearing on Antunasheaka's motion to transition to the least restrictive visitation plan; (4) terminating her parental rights under § 43-292(2), (5), and (7) because the State did not prove its case; (5) failing to grant a new trial or allow Antunasheaka to

recall the State's key witness to correct a false statement made by the witness during his testimony at trial; and (6) not allowing Antunasheaka to continue parenting time during the appeal, even though there was a beneficial relationship and a strong bond between the parent and child.

## IV. STANDARD OF REVIEW

An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the findings made by the juvenile court. *In re Interest of Mateo L. et al.*, 309 Neb. 565, 961 N.W.2d 516 (2021). However, when the evidence is in conflict, an appellate court may consider and give weight to the fact that the juvenile court observed the witnesses and accepted one version of the facts over another. *Id.*

## V. ANALYSIS

### 1. EXCEPTIONS HEARING

Antunasheaka assigns that the juvenile court erred when it found that no exception existed under § 43-292.02 which triggered the State to file a termination of her parental rights, and that the juvenile court used the wrong standard under (3)(c) of the statute. Section 43-292.02(1) obligates the State to file a petition to terminate parental rights when a child has been in foster care under the responsibility of the State for 15 or more months of the most recent 22 months. Within 30 days after the 15-month period under § 43-292.02(1), the court shall hold a hearing on the record and shall make a determination on the record as to whether there is an exception under § 43-292.02(3) in the particular case. Neb. Rev. Stat. § 43-292.03(1) (Reissue 2016).

The purpose of an exception hearing, derived from the plain language of § 43-292.03(1), is to determine whether the State may be excused from the mandatory requirement of filing a petition to terminate parental rights under certain circumstances, including those where a juvenile has been in foster care under the responsibility of the State for 15 of the most recent 22 months. *In re Interest of Clifford M. et al.*, 261 Neb. 862, 626 N.W.2d 549 (2001). The State is not required to file a petition to terminate if the juvenile court determines at the exception hearing that any of the circumstances specified in § 43-292.02(3) exist. *In re Interest of Clifford M. et al., supra*.

If such circumstances are not shown, § 43-292.03(1) provides that "the state shall proceed as provided in subsection (1) of section 43-292.02," which requires the filing of a petition to terminate parental rights under specified circumstances. *In re Interest of Clifford M. et al., supra*. While an exception hearing may afford a basis for *relieving* the State of its statutory obligation to file a petition to terminate under § 43-292.02(1), neither § 43-292.02 nor § 43-292.03 would *prevent* the State from petitioning for termination of parental rights under § 43-292 even if it were not required to do so. See *In re Interest of Clifford M. et al., supra*.

Antunasheaka argues that she did not have enough time to complete the juvenile court's orders because there was a 7-month gap of time when she was prevented from seeing Imani by the county court in her criminal misdemeanor case. However, the no-contact order was because Antunasheaka was charged with, and eventually pled to, child abuse of Imani. This no-contact provision was due to Antunasheaka's own behavior. Antunasheaka argues that she was not able to present evidence at the exceptions hearing or challenge providers or reports, that the juvenile court may have made another ruling, and that the juvenile court misstated the statute and did not include the exception for time to rehabilitate. While she identified the evidence she wanted to present

(DeLaet's updated report, visitation reports, and therapy reports), she does not explain what this evidence would have shown and how it would have resulted in a different ruling. In fact, DeLaet's updated reported found there was no change in his initial impressions. This would not have supported a different ruling.

As noted above, even if the juvenile court had found an exception under § 43-292.03, the State still could have filed the petition to terminate Antunasheaka's parental rights. Thus, even if Antunasheaka had been able to do as she argues with regard to evidence and challenging reports, it does not necessarily follow that a petition to terminate her parental rights would not have been filed. This assignment of error fails.

### 2. VISITATION ORDERS

Antunasheaka assigns that the juvenile court erred by giving control of visitation to DHHS instead of relying on the facts and making its own decisions and order. The juvenile court adopted the September 2022 case plan, which had scheduled supervised visitation between Antunasheaka and Imani twice a week from 3:30 p.m. to 6:30 p.m. In its September 2022 order, the juvenile court also stated that Antunasheaka shall "[h]ave reasonable rights of supervised parenting time with her daughter, Imani []; higher or lower levels of visitation shall be up to the discretion of [DHHS]." Without citing any authority, Antunasheaka argues this was an improper delegation of the juvenile court's responsibility.

It is an abuse of discretion for a trial court to delegate to a psychologist or third party the authority to determine when and if visitation can be had by the noncustodial parent. *Deacon v. Deacon*, 207 Neb. 193, 297 N.W.2d 757 (1980), *disapproved on other grounds, Gibilisco v. Gibilisco*, 263 Neb. 27, 637 N.W.2d 898 (2002). But here the juvenile court was not delegating the decision of when or if Antunasheaka could see Imani. It adopted the case plan which provided that Antunasheaka would see Imani twice a week from 3:30 p.m. to 6:30 p.m., thereby finding this frequency reasonable and in Imani's best interests. The juvenile court only allowed DHHS to determine if a higher or lower level of visitation would be utilized, not when and if Antunasheaka would see Imani. Having been directed to no authority which prohibits DHHS from making this determination, we find that the juvenile court did not err in this regard.

### 3. VISITATION HEARING

Antunasheaka assigns that the juvenile court erred by not setting a timely hearing on her motion to transition to a least restrictive visitation plan. On June 7, 2023, Antunasheaka filed a motion for unsupervised parenting time, and a hearing on the motion was set for July 19. On July 10, Antunasheaka's counsel filed a motion to continue the hearing because counsel had a funeral to attend and would be out-of-state from July 19 through July 21. The juvenile court granted the motion and moved the hearing from July 19 to the same date as the termination hearing, August 10. Antunasheaka's counsel filed an amended notice of hearing which changed the date for the visitation hearing to August 9.

Antunasheaka argues the juvenile court erred in not holding a timely hearing, but the hearing was scheduled approximately 6 weeks after she filed her motion, was continued at her counsel's request, and was rescheduled to be within a few weeks of the original hearing date. Antunasheaka argues that at a hearing on June 13, 2023, the juvenile court did not allow her to

move to unsupervised visits but reiterated that her motion would be heard on July 19. This hearing was not included in the record on appeal. There is nothing in the record before this court that would lead us to conclude that the juvenile court erred in this regard. This assignment of error is without merit.

### 4. TERMINATION OF PARENTAL RIGHTS

Antunasheaka assigns that the juvenile court erred in terminating her parental rights under § 43-292(2), (5), and (7) because "the State's evidence did not prove its case." The grounds for terminating parental rights are codified in § 43-292. Any of the 11 separate subsections of § 43-292 can serve as a basis for termination when coupled with evidence that termination is in the best interests of the child. *In re Interest of Mateo L. et al.*, 309 Neb. 565, 961 N.W.2d 516 (2021). The State has the burden to show by clear and convincing evidence both that one of the statutory bases enumerated in § 43-292 exists and that termination is in the child's best interests. *In re Interest of Mateo L. et al., supra*.

### (a) Statutory Grounds

Section 43-292(7) allows for termination when the juvenile has been in out-of-home placement for 15 or more months of the most recent 22 months. This subsection operates mechanically and, unlike the other subsections of the statute, does not require the State to adduce evidence of any specific fault of the parent. *In re Interest of Mateo L. et al., supra*. In other words, if the 15-out-of-22 formula is met, § 43-292(7) is met. *In re Interest of Mateo L. et al., supra*. Here, the State provided evidence that Imani has been in out-of-home placement for well over 15 of the most recent 22 months. She was removed from her mother's care on December 2, 2021, and the motion for termination of Antunasheaka's parental rights was filed on May 4, 2023, 17 months later. Imani remained in out-of-home placement the entire time. Since we find that § 43-292(7) has been met, we need not consider other statutory grounds. See *In re Interest of Mateo L. et al., supra* (where one statutory basis has been established, appellate court need not consider sufficiency of evidence concerning State's other statutory bases for termination).

### (b) Best Interests and Unfitness

Whereas statutory grounds are based on a parent's past conduct, the best interests inquiry focuses on the future well-being of the child. *In re Interest of Mateo L. et al., supra*. The Nebraska Supreme Court has stated that the Due Process Clause of the U.S. Constitution would be offended if a State were to attempt to force the breakup of a natural family, over the objections of the parents and their children, without some showing of unfitness. See *In re Interest of Mateo L. et al., supra*. As such, we apply a rebuttable presumption that it is in the child's best interests to maintain a relationship with his or her parent. *Id*. That presumption can only be overcome by a showing that the parent is either unfit to perform the duties imposed by the relationship or has forfeited that right. *Id*.

Although the term "unfitness" is not expressly stated in § 43-292, it derives from the fault and neglect subsections of that statute and from an assessment of the child's best interests. *In re Interest of Mateo L. et al., supra*. In this context, parental unfitness means a personal deficiency or incapacity that has prevented, or will probably prevent, the performance of a reasonable parental

obligation in child rearing and that has caused, or probably will result in, detriment to the child's well-being. *Id*. The best interests and parental unfitness analyses require separate, fact-intensive inquiries, but each examines essentially the same underlying facts. *Id*.

Like the juvenile court, we acknowledge that Antunasheaka has made progress in this case. She is living in an apartment and is not abusing substances. The testimony from employees of the Stephen Center all focused on the progress Antunasheaka has made and their favorable impressions of her. Employees of the Stephen Center reported that Antunasheaka had been randomly drug tested since residing there and had never had a positive test. As part of the requirements of her housing, Antunasheaka is subject to monthly room checks and must meet with a case manager monthly. Antunasheaka also attended programming and earned certificates of completion. She was described as having progressed very well. We note, however, that some of the positive reports from Stephen Center employees were based in part on observations during a time when other people involved in this case reported concerns with Antunasheaka's behavior and progress.

A visitation worker reported that when Imani tried to "play fight" on a visit, Antunasheaka told Imani that they could not play that way anymore. Cusick stated that she believed Antunasheaka was honest with her, that she had seen progress, and that Antunasheaka had been able to identify her own particular issues, stressors, and strengths. But DeLaet expressed "a high level of caution" about Antunasheaka's ability to discharge her parental abilities once she leaves a structured environment.

There was also other concerning evidence presented. During her evaluation with DeLaet, Antunasheaka claimed that Imani was removed because Antunasheaka and Imani both overslept and when they woke up, Antunasheaka was "anxious" and grabbed Imani's shirt, and Imani's shirt had tear stains from crying. The therapist providing family therapy for Antunasheaka and Imani in June 2023 was asked whether Antunasheaka admitted that she had strangled Imani. The therapist stated that Antunasheaka did not say "strangled" but rather that she "disciplined" her daughter and that "she disciplined her daughter inappropriately." DeLaet noted that Antunasheaka reported that she pled to a misdemeanor charge on the advice of her attorney in the criminal case, despite wanting to fight the charges. Antunasheaka acknowledges that Imani has had trauma, but when asked the source of the trauma, she attributed it to "being removed from [her] care and being placed in foster care."

DeLaet concluded that Antunasheaka was at moderate to moderate-high risk to engage in future child maltreatment, with child abuse of her daughter being the most likely form of future maltreatment. Imani's foster mother described an incident in which Imani, when angry, placed her hands around her foster mother's neck and squeezed. Imani's therapist reported that even at the time of trial, Imani still could not discuss Antunasheaka for more than 2 minutes at a time before changing the subject. We note that DeLaet has not seen Antunasheaka in person since late 2022, and she has made progress since that time. However, this progress did not begin until the case had been open for over a year. And even during this period of progress, there were still concerns regarding Antunasheaka's medication management, compliance with therapy, disengagement with family therapy, and her recognition of how her actions affect Imani. Antunasheaka had still not provided evidence that she was compliant with medication, which is concerning as it had previously been reported that she would not take medication because it affected her personality.

In January 2023, Antunasheaka was discharged from her therapist for missing appointments and because her therapist believed Antunasheaka had returned to old habits, was blaming others, and did not feel she had anything else to work on. Also in January, Roberts noted that he believed his documentation "would suggest a consistent pattern of Antunasheaka's engagement until challenged followed then by avoidance, resistance, and disengagement." Roberts also stated that his "primary concern is Antunasheaka's pattern of narrative control of manipulation, use of violence and attitudes towards it, and response to challenges and/or push back on these beliefs or behaviors."

A June 2023 addendum to an April court report noted that since that court report, there was a visit where Antunasheaka became very upset and began crying and saying in front of Imani how she did not want to lose her. The foster parents reported that Imani was upset by the behavior and both the foster parents and Imani's therapist saw some of Imani's behaviors that they had not seen for quite a while, such as bed wetting and having nightmares. Antunasheaka stated that she "didn't know that her behavior would impact Imani in that way."

Von-Baruth noted in her testimony that if a person does not acknowledge that there is a problem, then the person cannot fix the problem. It does not appear, from the evidence presented at the termination hearing, that Antunasheaka has fully acknowledged the abuse that led to Imani's removal, nor has she acknowledged her mental health issues. She has also failed to recognize the way her behavior impacts Imani. Antunasheaka's failure to acknowledge the extent of the abuse that occurred, and failure to fully address her mental health issues, lead us to the conclusion that the juvenile court did not err in finding that the State had proven that Antunasheaka is unfit.

Despite the positive visitation reviews that reflect a bond between Antunasheaka and Imani, Imani continues to suffer from the trauma Antunasheaka inflicted upon her as evidenced by the therapist's testimony that Imani could not discuss Antunasheaka for more than 2 minutes at a time before changing the subject. At the time of the termination hearing, Imani had been in foster care for 20 months. Given Antunasheaka's inability to place herself in a position to provide care and support for Imani, we agree that it is in Imani's best interests to terminate Antunasheaka's parental rights. Children cannot, and should not, be suspended in foster care or be made to await uncertain parental maturity. *In re Interest of Jahon S.*, 291 Neb. 97, 864 N.W.2d 228 (2015). As such, the juvenile court did not err in terminating Antunasheaka's parental rights.

### 5. MOTION FOR NEW TRIAL

Antunasheaka assigns that the juvenile court erred in denying her motion for new trial or in not allowing her to recall a witness to correct a false statement made during his testimony at trial. Antunasheaka argues that DeLaet stated at trial that he saw her in March 2023, but that he did not have contact with her at any time in 2023. She claims that he testified that if he had seen her, his report might change. Antunasheaka argues the juvenile court gave great weight to DeLaet's testimony, and that she should have been given leeway to recall DeLaet to correct the record.

The juvenile court's order was filed September 1, 2023, and on September 5 Antunasheaka filed a motion for new trial and motion to reopen the record to clarify/correct. At the hearing on the motion, the juvenile court stated that it did not believe DeLaet gave false testimony, and that Antunasheaka's counsel did a significant job on cross-examination where DeLaet acquiesced and admitted that there was a chance he did not see Antunasheaka in person in March. The juvenile

- 12 -

court stated that it made no finding that DeLaet had contact with Antunasheaka in March, and that it would go to the weight and credibility of the witness and evidence. The juvenile court stated that its recollection was that DeLaet testified that he had been asked to provide an addendum with collateral information, and that is what he did.

We agree with the juvenile court that at the termination hearing, DeLaet eventually testified that he may not have met with Antunasheaka in March 2023 as he first stated. While the juvenile court did reference DeLaet's report and its addendum in its order, it also cited to other evidence presented at the termination hearing to support its decision. Reviewing the record as a whole, we cannot say the juvenile court erred in overruling the motion for a new trial.

### 6. VISITATION PENDING APPEAL

Antunasheaka assigns that the juvenile court erred in not allowing her to continue parenting time during this appeal even though there was a beneficial relationship and strong bond between her and Imani. The juvenile court's order terminating Antunasheaka's parental rights allowed for 1 month of supervised visitation and therapeutic contact, but it denied Antunasheaka's request to continue visitation throughout the appeal. As we have affirmed the juvenile court's termination of Antunasheaka's parental rights, we cannot find that it erred in denying Antunasheaka's motion to continue parenting time pending this appeal.

## VI. CONCLUSION

Finding no error in the juvenile court's rulings, we affirm the order terminating Antunasheaka's parental rights to Imani.

AFFIRMED.